Gotz, Respondent, vs. Gotz, Appellant.

*December 6, 1956—January 7, 1957.*

For the appellant there was a brief by *Steinmetz & Steinmetz,* attorneys, and *Herbert A. Eggie* of counsel, all of Milwaukee, and oral argument by *Mr. Eggie.*

For the respondent there was a brief by *I. A. Dinerstein* and *Aaron Weiss,* attorneys, and *Howard G. Brown* of counsel, all of Milwaukee, and oral argument by *Mr. Brown.*

MARTIN, J. Sec. 247.24, Stats., provides in part:

". . . Whenever the welfare of any such child will be promoted thereby, the court granting such decree shall always have the power to change the care and custody of any such child, either by giving it to or taking it from such parent, relative, or agency, . . ."

Matters dealing with the custody of children are peculiarly within the jurisdiction of the trial court, and highly discretionary. See *State ex rel. Hannon v. Eisler* (1955), 270 Wis. 469, 71 N. W. (2d) 376.

Appellant maintains it was an abuse of discretion for the lower court to deny his motion for termination of the visitation rights of the maternal relatives since he had shown that

the visits of the aunts had some unfavorable effects on the child.

There is in this case a long history of conflict between the parents of the child, and it is evident from the record that the child has suffered severely from that conflict. The situation existed some time before the divorce. Then the mother was granted the divorce and permanent custody of the boy. Being ill, she was given the right to move to Florida with the child where, apparently, she has lived with her mother since about October of 1953.

In July of 1954 the father was given temporary custody of the boy with the provision that the maternal relatives should have the right to visit him for a few hours on one day each week. Appellant testified that these visits, which were carried on over a period of some ten months, always left the boy emotionally disturbed and upset, sometimes for days thereafter.

It was the trial court's conclusion that the visits themselves were not detrimental to the child but, rather, the effect of the appellant's resentment of the visits which grew out of the father's hostility toward his wife's sisters.

Dr. James Johnson, psychiatrist employed by Milwaukee County Guidance Clinic, testified that when he examined the child in January of 1955—

". . . it was my impression that this was a severely emotionally disturbed child whom I did not feel was, frankly, psychotic at that time, but, rather, I thought of him as a borderline case, meaning that his regression was such that he would be—some people would think he might be close to being mentally ill or psychotic. I found, too, he had a very low level of social, emotional, and intellectual functioning at that time. At that time I did recommend that the boy should have therapy in the Guidance Clinic."

The child received therapy during the period between January of 1955 and the time of this hearing. At the request

of the divorce counsel Dr. Johnson gave his views as to the effect of the relatives' visits with the child, as follows:

"Objectively we have observed no favorable or unfavorable effects of the visits on the child. By this we mean that the child makes no comment about the visits, nor has his play shown any indication that they were causing him to slip backward in his progress. During the course of our contact with this child, we have noticed a gradual but definite improvement in his over-all personality growth. The father has been most co-operative and conscientious in his contacts with us. The father, Mr. Gotz, has reported that the boy seems upset in regard to his visits with the maternal relatives. There is little doubt that the father is anxious about these visits. His concern appears to stem from the fear that the child is being harmed, plus the fact that his own relationship with these relatives is not a smooth and easy one. . . . When considering a problem like this, one cannot think just in terms of the child but must think in terms of tension in the total family unit including the child and father, who compose the main family unit at this particular time. In other words, if there is tension within the unit, father-son, regardless of where this tension comes from, it will tend to cause anxiety in the child in regard to the visits. Thus we can express the opinion that these visits do seem to produce anxiety within the father-son unit. Thus we question whether they are helpful to the child from the emotional point of view. From our point of view, the visits do appear to be upsetting this home situation. Therefore, we can see no particular advantage to their being continued at this time. This opinion has nothing to do with rights from the legal point of view, nor does it have anything to do with our knowledge of the personality of the maternal relatives. If there is going to be continued friction and disagreement around these visits, it would appear that the only solution to this anxiety would be to eliminate the visits. . . . In our original remarks, we suggested that the boy's life be kept as simplified as possible. Tension over this matter complicates the life of the child; however, we must repeat that children can withstand anxiety even though it is not ideal for them. This means that we cannot state definitely that such visits will be permanently damaging to the child; yet they do not seem to be contributing much."

It was his opinion that the boy made "marked improvement" during the time the Guidance Clinic treated him.

The trial court stated:

"I recognize Dr. Johnson's desire to have Kenneth's home life be simple, easygoing, tranquil, but there has not been, in my opinion, a demonstration that the order was wrong in allowing visitations of the maternal aunts. There has not been a showing to my satisfaction that these visitations by the maternal aunts are detrimental to the child's health or welfare, and I am inclined to believe that Mr. Gotz has determined that these visitations should stop and feels it so strongly, whether it be of a sincere feeling or one developed only out of hostility toward his wife's relatives, but, nevertheless, he has allowed it to upset him to the point where his analyses of its effect on the child are not trustworthy.

"If the court were to adopt Mr. Gotz's view, in effect I would be reversing the judgment and order of this court simply because he does not approve of it, because Mr. Gotz does not approve of it. That, conceivably is doing an injustice to Mr. Gotz's rationale in this matter. It is possible that he is absolutely sincere and believes that the visits are against the child's best interests and feels it so firmly he becomes all upset and disturbed, and the result of that is that the child becomes disturbed. I incline more to the view that Mr. Gotz feels so strongly that these visitations should be stopped that he allows himself to be shaken by the visits and, thus, does his own child a disservice by the extreme of his attitude toward the visitations.

"There is nothing in this testimony today that has been presented to me which suggests that the department of domestic conciliation is opposed to the visitations as they now stand. I think it is a normal and desirable circumstance that the mother of this child, being unable to visit herself, should have her sisters make the visitations. I think that is completely wholesome and desirable not only from the mother's standpoint, but, even more important, from Kenneth's standpoint. I see no reason for the court to sever all ties between the child and his mother's family. . . . All the more so because the child is not a normal child. That fact has also much concerned me and has had much to do with my conclusions."

We agree with the trial court. It is generally a good thing for the child of divorced parents to maintain contact with both his father and mother. In this case, it being impossible for the mother to visit the child, it was within the discretion of the trial court to keep that contact alive through visits of her sisters.

The court addressed the following remarks to the father:

"The custody is in the father, and it is his responsibility and obligation to raise this child consistent with the rights of the mother to visit, consistent with the rights of the aunts to visit, and if we are to have a surcease to constant and, I am inclined to believe, unproductive litigation, it will require common sense and good faith on the part of the principals in this case. So, I say to you, Mr. Gotz, you may be able to avoid what you have complained of as the deleterious effects of these visits on your son by simply resolving that you will not become upset by them; that you will take them in stride and allow your child to make the visitations, and then if you find instability in the child after the visits, to devote yourself to easing his uncomfortable feelings. You certainly, in my opinion, are not helping by becoming upset yourself and by your relying on what you have construed as your legal rights in this matter. I think we now have gotten to the point in this case where the legalities have not provoked a happy circumstance. While it will be the responsibility of the court to enforce all of its orders and to enforce the arrangement that we have arrived at, the actual success of it will depend upon common sense on the part of the principals."

The advice is sound. From a reading of this record it seems entirely possible, however, that both the relatives and the father have allowed the desire to nourish their personal animosities to overshadow the welfare of this child. The parties have been in court almost constantly since the divorce. Since 1951 they have presented their various problems to seven different judges. We strongly urge that the judge who handled this particular question retain his supervision of the

matter in the future and that the court follow the progress of this child carefully to see whether he is indeed profiting by the arrangement now in effect. If we are correct in our impression that the parties are concerned with indulging their own hostilities rather than with promoting the welfare of the child, it may serve his interests more to place him in the hands of an agency whose primary concern will be to provide him with the simple, tranquil life which Dr. Johnson says is essential to his well-being.

The child is eight years old now. If he is to be given the opportunity to develop into a healthy, happy boy and a mature, responsible man, it would seem to us that opportunity should come soon.

*By the Court.*—Order affirmed.

STEINLE, J., took no part.