193 Wis.2d 649 (1995)
533 N.W.2d 419
IN RE the CUSTODY OF H.S.H.-K:
Sandra Lynne HOLTZMAN, Petitioner-Appellant,
v.
Elsbeth KNOTT, Respondent-Respondent.
No. 93-2911.
Supreme Court of Wisconsin.
Oral argument October 12, 1994.
Decided June 13, 1995.
*656 For the petitioner-appellant there was a brief by Judith Sperling Newton, Carol M. Gapen and Stafford, Rosenbaum, Rieser & Hansen, Madison and oral argument by Judith S. Newton.
For the respondent-respondent there was a brief by Charles Schutze, Kelly Kinzel and Schutze Law Offices, Madison and oral argument by Charles Schutze.
Guardian Ad Litem briefs were filed (in the Court of Appeals) by Linda S. Balisle and Balisle & Roberson, S.C., Madison and oral argument by Linda S. Balisle.
Amicus curiae brief was filed by Shannan Wilber and Youth Law Center, San Francisco, CA; Marvin Ventrell and National Association of Counsel for Children, Denver CO and Joan Heifetz Hollinger, University of California, for the Youth Law Center and National Association of Counsel for Children.
*657 SHIRLEY S. ABRAHAMSON, J.
Sandra Lynne Holtzman appeals from an order of the circuit court for Dane county, George A.W. Northrup, circuit judge, dismissing her petition seeking custody of or visitation rights to H.S., the biological child of Elsbeth Knott. We granted the guardian ad litem's petition to bypass the court of appeals. Section (Rule) 809.60, Stats. 1991-92. We affirm that part of the order dismissing the petition for custody; we reverse that part of the order dismissing the petition for visitation rights and remand the case to the circuit court for proceedings consistent with this opinion.
Two issues of law are presented in this case. The first issue is whether Holtzman's assertions of Knott's parental unfitness and inability to care for the child, or of compelling circumstances requiring a change of custody, are sufficient to proceed on a petition for custody under sec. 767.24(3), Stats. 1991-92. The second issue is whether Holtzman may seek visitation rights to the child.[1]
We agree with the circuit court that Holtzman has not raised a triable issue regarding Knott's fitness or ability to parent her child and has not shown compelling circumstances requiring a change of custody. Therefore the circuit court properly dismissed the custody action commenced under sec. 767.24(3), Stats. 1991-92.
*658 For the reasons set forth, we conclude that the ch. 767 visitation statute, sec. 767.245, Stats. 1991-92, does not apply to Holtzman's petition for visitation rights to Knott's biological child. However, we further conclude that the legislature did not intend that sec. 767.245 be the exclusive means of obtaining court-ordered visitation, or that it supplant or preempt the courts' long recognized equitable power to protect the best interest of a child by ordering visitation under circumstances not included in the statute. Finally, mindful of preserving a biological or adoptive parent's constitutionally protected interests and the best interest of a child, we conclude that a circuit court may determine whether visitation is in a child's best interest if the petitioner first proves that he or she has a parent-like relationship with the child and that a significant triggering event justifies state intervention in the child's relationship with a biological or adoptive parent. To meet these two requirements, the petitioner must prove the component elements of each one.
To demonstrate the existence of the petitioner's parent-like relationship with the child, the petitioner must prove four elements: (1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child; (2) that the petitioner and the child lived together in the same household; (3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation;[2] and (4) that the petitioner has been in a parental role for a length of time sufficient *659 to have established with the child a bonded, dependent relationship parental in nature.[3]
To establish a significant triggering event justifying state intervention in the child's relationship with a biological or adoptive parent, the petitioner must prove that this parent has interfered substantially with the petitioner's parent-like relationship with the child, and that the petitioner sought court ordered visitation within a reasonable time after the parent's interference.
The petitioner must prove all these elements before a circuit court may consider whether visitation is in the best interest of the child. The proceedings must focus on the child. When a non-traditional adult relationship is dissolving, the child is as likely to become a victim of turmoil and adult hospitality as is a child subject to the dissolution of a marriage. Such a child needs and deserves the protection of the courts as much as a child of a dissolving traditional relationship. In re Interest of Z.J.H., 162 Wis 2d 1002, 1033, 471 N.W.2d 202 (1991) (Bablitch, J. dissenting).
We remand the issue of visitation to the circuit court for proceedings consistent with this opinion.

I.
The facts as found by the circuit court are as follows:
Holtzman and Knott are two women who shared a close, committed relationship for more than ten years. Holtzman and Knott met in February 1983. In October 1983, they began to live together in a home they jointly *660 purchased in Boston, Massachusetts. On September 15, 1984, they solemnized their commitment to each other, exchanging vows and rings in a private ceremony.
They decided early in their relationship to rear a child together by having Knot artificially inseminated with sperm from an anonymous donor. After a miscarriage and illness, Knott became pregnant in March 1988. Holtzman and Knott attended obstetrical visits and childbirth classes together.
The child was born on December 15, 1988. Holtzman was present during labor and delivery and took three weeks off from work to stay with Knott and the child. Holtzman and Knott jointly selected a name for the baby, using first and middle names from each of their families and a surname which combined their last names. Both women were named as the child's parents at the child's dedication ceremony at their church. Holtzman's parents were recognized as the child's grandparents and Holtzman's sister was formally named as his godmother.
From December 1988 until January 1, 1993, Holtzman provided the primary financial support for Knott, herself and the child and both women shared child-care responsibilities. Together, the three attended church, went on outings and celebrated holidays. Holtzman devoted herself to the child and spent individual time with him.
The two women explained to the child that there are many kinds of families and that he had two parents who loved him very much. The child called Holtzman "My San," and each year on Father's Day Holtzman, Knott and the child celebrated their own special holiday honoring Holtzman.
*661 Holtzman, Knott and the child moved to Madison, Wisconsin, in June 1992 so that Holtzman could attend law school. They sold their home in Boston and bought a home in Madison, not far from Holtzman's family. The child became attached to Holtzman's parents as his grandparents and to Holtzman's sister as his aunt and godmother.
During the fall of 1992, Holtzman claims to have noticed a change in Knott's behavior. She asserts that Knott suffered from depression and her care for the child deteriorated.
On January 1, 1993, Knott told Holtzman that their relationship was over. The two women agreed that they would continue to live together in the home for the child's sake. On May 26, 1993, Knott and the child moved out of the house. Holtzman made every effort to maintain contact with the child and spent as much time with him as Knott would allow. On August 24, 1994, Knott informed Holtzman that she was terminating Holtzman's relationship with the child.
Two days later, on August 26, 1993, Knott sought an order in Dane county circuit court to restrain Holtzman from having any contact with her or the child, claiming Holtzman had threatened or intimidated her. At the hearing on the petition, held on September 1, 1993, before Dane County Circuit Judge Richard J. Callaway, the two women entered into a stipulation on the record. Knott agreed to dismiss the petition; Holtzman agreed not to contact Knott. Both women agreed to participate in a physical placement study to be conducted by the Dane County Family Court Counselling Service, and to have a guardian ad litem appointed for the child.
Holtzman filed a petition for custody on September 16, 1993, and a petition for visitation on September 21, *662 1993. On September 29, 1993, Knott filed a motion for summary judgment.
After interviewing the child, the guardian ad litem reported the following facts to the circuit court: The child stated that he believed Holtzman was his parent and that he would like to see, spend time with and telephone Holtzman. He was able to recite Holtzman's new address and telephone number. The child acknowledged that his mother no longer viewed Holtzman as his parent, that she would be upset if he continued to see Holtzman, but that he wanted to see her anyway. He stated that he did not consider anyone other than Holtzman and Knott to be his parents.
The circuit court reluctantly granted Knott's motion for summary judgment. It concluded that the current visitation law, while seeking to protect the best interest of children in traditional families torn asunder, ignores the welfare of children reared by adults in nontraditional relationships when those relationships terminate. According to the circuit court, the visitation law does not recognize the parent-like bond that forms between a child and a parent's non traditional partner and the subsequent trauma to the child when the adult relationship dissolves. Urging this court and the legislature to reexamine the law in light of the realities of modern society and the best interest of the children, the circuit court wrote as follows:
The court sees this as a case where a family member ought to have the right to visit and keep an eye on the welfare of a minor child with whom she has developed a parent-like relationship. Unfortunately because the law does not recognize the alternative type of relationship which existed in this case, this court can not offer the relief Holtzman seeks. *663 Decision and order at 8.
The circuit court continued this thought as follows:
There are an increasing number of children in this society for whom the mother is the only known biological parent. Frequently that mother forms a lengthy relationship living with another persons, be they man or woman, who assumes a parental role in the child's life for many years. Why should such children be denied the love, guidance and nurturing of the parental bond which developed simply because the adults cannot maintain their relationship? Lack of love and guidance in the lives of children is a major problem in our society. Does it make sense for the law to worsen this sad fact by denying a child contact with one they have come to accept as their parent, especially when it clearly appears to be in the best interest of the child?
Decision and order at 17.[4]
Holtzman appealed from the order. This court granted the guardian ad litem's petition to bypass the court of appeals.

*664 II.
Holtzman asserts that her action for custody is governed by sec. 767.24, Stats. 1991-92, which provides as follows:
(1) GENERAL PROVISIONS. In rendering a judgment of annulment, divorce, or legal separation, or in rendering a judgment in an action under s. 767.02(1)(e) [custody], the court shall make such provisions as it deems just and reasonable concerning the legal custody and physical placement of any minor child of the parties, as provided in this section.
. . .
(3) CUSTODY TO AGENCY OR RELATIVE. (a) If the interest of any child demands it, and if the court finds that neither parent it able to care for the child adequately or that neither parent is fit and proper to have the care and custody of the child, the court may declare the child to be in need of protection or services and transfer legal custody of the child to a relative of the child, as defined in s. 48.02(15), to a county department, as defined under s. 48.02 (2g), or to a licensed child welfare agency....
[1,2]
Holtzman claims that she has "standing" to bring an action under sec. 767.24, Stats. 1991-92, to obtain custody of the child. The concept of "standing" is used in custody actions to mean that the petitioner "has status to bring an action for custody under the applicable statute." In re Interest of Z.J.H., 162 Wis. 2d 102, 1008 n.3, 471 N.W.2d 202 (1991). A person who is not a biological or adoptive parent may not bring an action to obtain custody of a minor unless the biological or adoptive parent is "unfit or unable to care for the child's or there are compelling reasons for awarding custody to a *665 nonparent. Z.J.H., 162 Wis. 2d at 1009; Barstad v. Frazier, 118 Wis. 2d 549, 568, 348 N.W.2d 479 (1984).
[3]
The court has equated the showing required to prove that a parent is "unfit or unable to care for the child" with the showing required of persons petitioning for the termination of parental rights. Barstad, 118 Wis. 2d at 556. See also Z.J.H., 162 Wis. 2d at 1010 (suggesting that in a custody action the parent's fitness is evaluated according to the standards used for a child in need of protection or services (CHIPS) proceeding). A fit and able parent may, however, be denied custody under compelling circumstances. Barstad, 118 Wis. 2d at 564. Compelling circumstances include abandonment, persistent neglect of parental responsibilities, extended disruption of parental custody, or "other similar extraordinary circumstances that would drastically affect the welfare of the child." Barstad, 118 Wis. 2d at 568.
[4,5]
The circuit court concluded that Holtzman had not shown a triable issue regarding Knott's fitness or ability to care for the child. Nor had Holtzman established the existence of compelling circumstances that would warrant a hearing on transferring custody from Knott, the biological parent.[5] We agree with the circuit court's *666 evaluation of the record. Summary judgment is properly entered when the pleadings and depositions, together with affidavits, do not establish a genuine issue of material fact. No triable issue of fact regarding Knott's fitness or ability to care for the child has been presented. Nor do the facts alleged rise to the level of compelling circumstances. Thus we conclude as a matter of law that the facts presented fail to meet the standards set forth in sec. 767.24. Accordingly we affirm this part of the circuit court's order.

III.
The circuit court's conclusion that Holtzman has no "standing" to bring a custody action became the basis for its dismissal of Holtzman's petition for visitation. Citing Z.J.H., 162 Wis. 2d at 1020, the circuit court concluded that before it could consider whether granting Holtzman visitation under sec. 767.245(1), Stats. 1991-92, was in the child's best interest "there must be an underlying action affecting the family." Because the custody action was dismissed, the circuit court concluded that there was no underlying action affecting the family in this case.
[6] It is important to note that the ch. 767 visitation statute, sec. 767.245(1), Stats. 1991-92, does not explicitly require an underlying action affecting the family before a circuit court may determine whether a *667 petitioner's relationship with a child falls within the statute and whether visitation is in the child's best interest. The ch. 767 visitation statute reads as follows:
Section 767.245(1). Upon petition by a grandparent, great-grandparent, stepparent or person who has maintained a relationship similar to a parent-child relationship with the child, the court may grant reasonable visitation rights to that person if the parents have notice of the hearing and if the court determines that visitation is in the best interest of the child.
Holtzman argues that she may petition for visitation under this statute because she has maintained a relationship similar to a parent-child relationship with Knott's biological child and because her estrangement from Knott was a de facto divorce, that is, "an action affecting the family."
Our analysis of the ch. 767 visitation statute and the cases interpreting it compels us to conclude that Holtzman is in error. Section 767.245, Stats. 1991-92, does not apply to the facts of this case. The legislature enacted the ch. 767 visitation statute with the dissolution of marriage in mind. This case does not involve a marriage or its dissolution. This conclusion, however, does not end our inquiry. Our analysis of the ch. 767 visitation statute and the cases also demonstrates, as we explain below, that the legislature did not intend sec. 767.245 to be the exclusive provision on visitation. Nor did the legislature intend the ch. 767 visitation statute to supplant or preempt the courts' long standing equitable power to protect the best interest of a child by ordering visitation in circumstances not included in the statute. In other words, the legislature did not intend sec. 767.245 to "occupy the field" of visitation. *668 We begin our examination of whether a circuit court should consider Holtzman's petition for visitation with an analysis of the ch. 767 visitation statute.

A.
[7,8]
To understand the current ch. 767 visitation statute we must look at its history, which reveals the often conflicting policies underlying visitation law. Visitation law balances a biological or adoptive parent's constitutionally protected liberty interest in determining how to rear a child[6] against the best interest of the child. The state not only must respect a biological or adoptive parent's constitutional right, but also must recognize when state intervention in a parent-child relationship is necessary to protect a child's best interest. Visitation law is thus concerned with identifying the triggering events that may justify state intervention.
Prior to 1975, the courts determined without statutory authorization the visitation rights of noncustodial parents and others. In 1975, the legislature enacted two separate visitation statutes relating to *669 grandparent visitation.[7] Both of the 1975 grandparent visitation statutes assured grandparents' rights to visitation on the occurrence of specific triggering events. One statute, sec. 880.155, Stats. 1975 (in ch. 880 entitled Guardians and Wards), provided grandparents with visitation rights following the death of a child's parent. This statute is still in existence. Section 880.155, Stats. 1993-94. The other statute, contained in chapter 247 entitled "Actions Affecting Marriage," was the precursor to the current ch. 767 visitation statute and expressly governed grandparent visitation when a court rendered "a judgment of annulment, divorce or legal separation."[8] This statute, sec. 247.24(1)(c), Stats. 1975, provided as follows:
Section 247.24 Judgment; care and custody of minor children. (1) In rendering a judgment of annulment, divorce or legal separation, the court may:

. . . .
(c) Grant reasonable visitation privileges to a grandparent of any minor child if the court determines that it is in the best interest and welfare of the child and issue any necessary order to enforce the same. (Emphasis added.)
In 1977, the legislature substantially revised sec. 247.24 by enacting the Divorce Reform Act (ch. 105, Laws of 1977). Under the 1977 statute, grandparent *670 visitation was no longer expressly limited to circumstances in which a circuit court had rendered a judgment of annulment, divorce or legal separation.[9] The 1977 ch. 247 grandparent visitation provision read as follows:
Section 247.245 Visitation.
(4) The court may grant reasonable visitation privileges to a grandparent or greatgrandparent of any minor child upon the grandparent's or greatgrandparent's petition to the court with notice to the parties if the court determines that it is in the best interests and welfare of the child and issue any necessary order to enforce the same.
Although the 1977 ch. 247 visitation statute did not explicitly limit visitation to circumstances in which a circuit court rendered a judgment of annulment, divorce or legal separation, the legislative purpose section of the 1977 Divorce Reform Act discloses that the entire law was directed to actions affecting marriage.[10] *671 In addition, the entire structure of the new statute reveals the legislature's intent to limit its application. Unlike the 1975 ch. 247 visitation statute, the 1977 version focused primarily on the visitation privileges of a noncustodial parent upon the dissolution of a marriage. It seems reasonable to conclude that the legislature intended the grandparent visitation section to apply only under the same circumstances, thus retaining the limits on judicial intervention in a parent-child relationship that had accompanied the earlier ch. 247 visitation statute. These limits restrained a court from granting visitation to a grandparent unless the marriage of the child's parents was dissolving.[11]
In 1988, the legislature amended the 1977 ch. 247[12] grandparent visitation statute by enacting a detailed law relating to custody of children upon dissolution *672 of Marriage.[13] The major change in 1988, as explained by the Legislative Council's Special Committee notes, was to extend "the current law permitting the court, upon petition, to grant visitation rights to a grandparent or greatgrandparent to: (1) a stepparent; and (2) any person who has maintained a relationship similar to a parent-child relationship with the child."[14] These additions shaped the visitation statute into its present form.
Like the 1977 grandparent visitation statute upon which it is based, the 1988 ch. 767 visitation provision does not expressly limit a petition for visitation to actions affecting the marriage or actions affecting the family. Once again, however, the legislature appears to have intended that visitation petitions brought under sec. 767.245 be considered within the context of a dissolving marriage. The 1988 amendment was formulated by the Legislative Council Special Study Committee on Custody Arrangements. The charge to the committee,[15] the minutes of the committee's meetings, the committee's comment on the Act,[16] and the Wisconsin Legislative Council Staff Information Memorandum *673 on the 1988 amendment[17] all reveal that the committee's primary concern was with custody issues prompted by the divorce or legal separation of a married couple.[18] Nor did the legislature use the 1988 amendment to alter a court of appeals decision, Van Cleve v. Hemminger, 141 Wis. 2d 543, 415 N.W.2d 571 (Ct. App. 1987), which interpreted the 1977 statute as requiring an action affecting the family.
In 1991, the legislature added a third visitation statute, this time to ch. 48, the Children's Code, allowing certain relatives who have maintained a relationship with a child similar to a parent-child relationship to seek visitation on adoption of a child by a stepparent or relative.[19] Had the legislature intended *674 the ch. 767 visitation statute to apply to circumstances other than the dissolution of a marriage, it could have amended sec. 767.245. Instead it created this new statute. The legislature apparently intended sec. 767.245 to apply to limited circumstances and the new statutory provision to govern other limited circumstances justifying state intervention. The legislature did not intend any or all of the three visitation statutes to preempt the entire field of visitation.
The legislature's intent that sec. 767.245 be triggered by marriage and its dissolution is also evident in the statutory requirement that a petition for ch. 767 visitation, like a petition for divorce, separation and annulment, shall be entitled "In re the Marriage of A.B. and C.D." Section 767.05(5), Stats. 1991-92.
This recitation of the history of the three visitation statutes illustrates the continuing legislative concern with identifying the triggering events that warrant state interference in an otherwise protected parent child relationship. As we have seen, the triggering event most often manifest in the history of the ch. 767 visitation statute (and the case law interpreting it) has been the dissolution of a marriage, that is, an annulment, divorce or separation.[20] *675 After 1977, without the explicit restrictions in the 1975 visitation statute that visitation be granted by a judgment of annulment, divorce or legal separation, courts were left to resolve under what circumstances the visitation statute allowed them to intervene in a parent-child relationship to determine whether visitation was in the best interest of a child.
Van Cleve v. Hemminger, 141 Wis. 2d 543, 415 N.W.2d 571 (Ct. App. 1987), considered a grandparent's right to petition for visitation under the ch. 767 visitation statute, sec. 767.245(4), Stats. 1985-86, when the child and both parents lived together. In Van Cleve, the court of appeals construed the visitation statute to apply only to cases where an underlying "action affecting the family" had previously been filed. It concluded that the legislature did not intend the visitation provision "to reach into intact families to override parental determinations involving visitation privileges between their children and the grandparents." 141 Wis. 2d at 546-47 (emphasis added).
The Van Cleve court of appeals based its interpretation of the ch. 767 visitation statute on several factors. First, it reviewed the legislative history described above and concluded that the legislature intended to limit the application of the statute. Second, it reasoned that if the ch. 767 visitation statute were interpreted to apply to visitation under all circumstances, sec. 880.155, governing grandparent visitation at the death of a parent, would be superfluous. Third, the court of appeals determined that public policy encourages state intervention in a parent-child relationship when a family dissolves; under such circumstances the state may mitigate a child's trauma and protect a child's best interest by ordering visitation *676 with appropriate adults. Van Cleve, 141 Wis. 2d at 549.[21]
This court adhered to the Van Cleve decision in three recent cases: In re Marriage of Soergel, 154 Wis. 2d 564, 453 N.W.2d 624 (1990); In re Interest of Z.J.H., 162 Wis. 2d 1002, 1014, 471 N.W.2d 202 N.W.2d (1991); and Cox v. Williams, 177 Wis. 2d 433, 502 N.W.2d 128 (1993). In each case the court held that the legislature intended the ch. 767 visitation statute to apply only "in divorce or custody cases or in other actions affecting the marriage." Soergel, 154 Wis. 2d at 573.
In Soergel, the parents were divorced, the biological father had terminated his parental rights, and the stepfather had adopted the child. The biological paternal grandparents petitioned for visitation, arguing that their visitation rights to the child should turn solely upon the court's determination of the child's best interest. The court on a 6-0 vote concluded that sec. 767.245(4), Stats., 1985-86, was not intended to interfere with such parental decisions. Soergel, 154 Wis. 2d at 574.[22]
*677 In Z.J.H., relying on Van Cleve and Soergel, a divided court (5-2) concluded that there was no authority for an adoptive mother's former female partner to petition for visitation with the child. Z.J.H., 162 Wis. 2d at 1014. Without defining family and without further explanation, the majority simply declared (1) that the adoptive mother and child formed an intact family, (2) that the presence of an intact family signals the absence of a dissolving family relationship, and (3) that the legislature did not intend sec. 767.245(1), Stats. 1989-90, to grant third parties visitation with a child in an intact family. The majority did not consider whether the dissolution of the relationship between the mother and her partner might constitute the dissolution of a family.
The Z.J.H. decision does not make clear whether it rests on the requirements that a family be dissolving (that is, not intact) or on the requirement set forth in Van Cleve that an action affecting the family be filed. Indeed the majority acknowledges that its decision rests on either of the following two bases: (1) the mother and the child are an "intact family unit" or (2) there is no "underlying action affecting the family unit." Z.J.H., 162 Wis. 2d at 1022.
This confusion was compounded in the most recent supreme court case interpreting the ch. 767 visitation statute, Cox v. Williams, 177 Wis. 2d 433, 502 N.W.2d 128 (1993). In Cox, the issue was whether a stepmother could seek visitation under sec. 767.245(1) with the child of her deceased husband and his first wife, the child's biological mother. Reversing the court of appeals, a divided court (4-3) concluded that the stepmother had no standing, even though the father had custody of the child from the time of his divorce to the *678 time of his death, and the stepmother had acted as a parent to the child for five years.
Citing Van Cleve and Z.J.H., the Cox majority required two components in a petition for visitation under sec. 767.245(1): (1) that an "underlying action affecting the family unit has previously been filed" and (2) that the child's family is not intact so that it may be in the child's best interest to order visitation to mitigate the trauma and impact of the dissolving family relationship. Cox, 177 Wis. 2d at 439.
In addition to determining that there was no underlying action affecting the family, the majority in Cox concluded that the child's family was intact. After the father's death, said the court, the child's family consisted only of the child and his biological mother. Cox, 177 Wis. 2d at 440.
In summary, the cases interpreting the ch. 767 visitation statute have determined that a circuit court may hear a petition for visitation (1) when there is either "an underlying action affecting the family" or "a dissolving family" or (2) when both "an underlying action affecting the family" and "a dissolving family" exist.[23]
Courts have had difficulty interpreting and applying these broadly stated triggering events. First, courts have reached no consensus about which statutorily defined "actions affecting the family" suffice to meet the court-imposed "actions affecting the family" requirement with respect to petitions for visitation.[24] *679 Second, the very concept of "family" is not defined, either in the visitation statute or in the case law.[25] The absence of a definition of family makes the question of whether a family is "dissolving" or "intact" virtually impossible to resolve.
Despite the confusion surrounding the conditions that must exist before a circuit court may consider a *680 petition for visitation under sec. 767.245, the statute and cases reveal a thread consistently woven into the law of visitation: a concern that state intervention in a parent's determination of how to rear a child, a constitutionally protected liberty interest, must be justified by a triggering event. With respect to visitation, this triggering event must be more than a claim that a third party's visitation is in a child's best interest.
As our analysis of the ch. 767 visitation statute and the cases demonstrates, the events triggering application of the statute relate to the dissolution of a marriage. The rationale of the legislature and the courts has been that the end of a marriage adversely affects a child and may result in the separation of the child from a parent, signalling that state intervention in a parent-child relationship may be necessary to protect the child's best interest.
[9]
In short, the legislature did not intend the ch. 767 visitation statute to apply in the absence of the dissolution of a marriage.[26] The child in this case was not born of a marriage or adopted during a marriage, and his biological mother has not been married during his life. We therefore conclude that the legislature did not intend the ch. 767 visitation statute to apply to this *681 case. The circuit court appropriately refused to stretch the statute to fit in the absence of a dissolved marriage. Accordingly, we conclude that Holtzman's reliance on sec. 767.245 is misplaced.
This conclusion does not, however, necessarily eliminate Holtzman's ability to seek visitation with Knott's child unless we also conclude that the legislature intended the courts' power to order visitation in the best interest of a child to derive exclusively from sec. 767.245.

B.
The history of visitation law, the legislative enactments and the cases demonstrate that the legislature did not intend sec. 767.245 either to be an exclusive grant of power to the courts to determine visitation or to limit the court's equitable power to protect the best interest of a child by ordering visitation.
First, the history of visitation law in this state shows that the courts governed visitation before it was regulated by statute. Two early and frequently cited Wisconsin cases granting nonparent visitation arose when no statute authorized a court to order visitation: Weichman v. Weichman, 50 Wis. 2d 731, 184 N.W.2d 882 (1971), and Ponsford v. Crute, 56 Wis. 2d 407, 202 N.W.2d 5 (1972). The court concluded in these cases that although the divorce statute at issue was silent about visitation, trial courts had the power to grant visitation to nonparents. The Weichman court concluded that "there is no statutory or common-law rule which forbids a court in a divorce action from granting visitation to parents or to others. The question is not one of the power of the court but of judgment or of judicial discretion. The underlying principle ... is what is for the best interest and welfare of the child." *682 Weichman, 50 Wis. 2d at 734.[27] These early cases were the impetus behind the formulation of the first visitation statute in 1975.[28]Thus the courts do not derive their power over visitation from the statutes.
[10]
Second, nothing in the 1975, 1977, 1988 or 1991 visitation statutes states or implies that these visitation provisions are designed to displace a court's equitable power to protect the best interest of a child by ordering visitation under circumstances not included in the statutes. Statutory visitation applies under limited circumstances (adoption of a child, dissolution of marriage, paternity and death of a parent) and to certain persons. Secs. 48.925, 767.245, 767.51(6) and 880.155. At the same time the legislature has clearly and repeatedly expressed the policy that courts are to act in the best interest of children.[29] It is reasonable to *683 infer that the legislature did not intend the visitation statutes to bar the courts from exercising their equitable power to order visitation in circumstances not included within the statutes but in conformity with the policy directions set forth in the statutes.
[11]
We reached a similar conclusion about the legislative intent in ch. 767 in Watts v. Watts, 137 Wis. 2d 506, 405 N.W.2d 305 (1987), which involved property rights, not children. The parties in Watts had never married; they lived together, had children, and held themselves out as husband and wife. When the relationship ended, Sue Ann Watts sued for determination of property rights. The circuit court dismissed her action, concluding that ch. 767, authorizing a court to divide property in a dissolution of a marriage, does not apply to property division between unmarried persons. This court reversed, holding that ch. 767 did not preempt the courts' traditional power to settle contract and property disputes between unmarried persons. Similarly we conclude in the case at bar that the legislature did not intend the visitation statutes to preempt the courts' equitable power to protect the best interest of a child by ordering visitation in circumstances not included in the statutes.
The adoption and custody statutes, however, are different from the visitation statutes in regard to preemption. In contrast to visitation cases in which the court has expressly stated that the ch. 767 visitation statute has not supplanted the common law, the court has expressly declared that adoption is governed solely by the adoption statutes. See Adoption of Tschudy, 267 Wis. 272, 281, 65 N.W.2d 17 (1954) (stating that "[i]n Wisconsin, adoption proceedings are statutory"); In re Cheaney's Estate, 266 Wis. 620, 64 N.W.2d 408 (1954) *684 (concluding that adoption is statutory and that Wisconsin does not recognize equitable adoption); and Kenneth E. Worthing, Inheritance and Testamentary Rights With Respect to Adopted Children, 1953 Wis. L. Rev. 38, 39 (commenting that rights obtained through and from adoption are purely statutory).
The court has also expressly declared that custody is governed exclusively by the custody statutes, concluding that the legislature has preempted the field.[30]See, e.g., Hamachek v. Hamachek, 270 Wis. 194, 198, 70 N.W.2d 595 (1955) (declaring that "[c]ourts have no power in awarding custody of minor children other than that provided by statute"); Larson v. Larson, 30 Wis. 2d 291, 297, 140 N.W.2d. 230 (1966) (quoting with approval Hamachek's determination that custody is governed solely by statute); Groh v. Groh, 110 Wis. 2d 117, 123, 327 N.W.2d 655 (1983) (quoting with approval Hamachek's holding that the court's power in custody is governed by statute); Poeschel v. Poeschel, 115 Wis. 2d 570, 571-72, 341 N.W.2d 407 (Ct. App. 1983) (quoting Groh and Hamachek and concluding that the circuit court's only power in awarding custody of minor children stems from the custody statute); and Schwantes v. Schwantes, 121 Wis. 2d 607, 622, 360 N.W.2d 69 (Ct. App. 1984) (quoting Groh and Hamachek for the proposition that courts have no power to award custody of minor children other than as provided by statute).
*685 Third, this court has recently reaffirmed the courts' use of their equitable power to order visitation in the best interest of a child in circumstances not described in any visitation statute. In In re Custody of D.M.M., 137 Wis. 2d 375, 404 N.W.2d 530 (1987), a great aunt sought visitation. No statute authorized the award of visitation to a great aunt, yet the court granted her petition.[31]
In D.M.M. the court characterized the visitation statute as ambiguous, stating that it was not clear whether the statute preempted the common law or merely codified "existing law which was not intended to abrogate the visitation rights of others when the best interests of the child warrant...." D.M.M., 137 Wis. 2d at 386. Reviewing the history of the visitation statute, the court concluded that the grandparent language "was intended to supplement common law rights of grandparents and others to petition for visitation ... [and was not intended as] a supplantation of the common law." D.M.M., 137 Wis. 2d at 388. See also D.M.M., 137 Wis. 2d at 390. The D.M.M. court declared repeatedly that the 1977 visitation statute as renumbered, sec. 767.245(4), Stats. 1985-86, did not preclude persons other than grandparents and great-grandparents from petitioning for visitation. This statute merely insured grandparents a statutory right to visitation that was "not subject to developing and changing common law." D.M.M., 137 Wis. 2d at 387. Section 767.245 *686 was "a codification of case law to further protect grandparent and greatgrandparents' rights and was not meant thereby to exclude other relatives." D.M.M., 137 Wis. 2d at 390.
This court again sanctioned the courts' equitable power to order visitation more recently in Z.J.H. Citing D.M.M., the Z.J.H. court concluded that "the legislature did not intend to supplant the common law" of visitation when it enacted the ch. 767 visitation statute and did not intend sec. 767.245 to be the exclusive means of petitioning for visitation rights. Z.J.H., 162 Wis. 2d at 1014.
This characterization of the power of a circuit court to determine visitation rights apart from the ch. 767 visitation statute comports with this court's precedents recognizing the plenary power of circuit courts and their equitable jurisdiction over children. In Dovi v. Dovi, 245 Wis. 50, 55, 13 N.W.2d 585 (1944), the trial court denied the parties a divorce but entered a judgment on the custody of the children. No statute empowered the court to enter such a judgment. The mother challenged the court's authority, arguing that the court has no common law jurisdiction over divorce because divorce law is statutory, and, most importantly, that the legislature had repealed the very statute that had expressly authorized the court to act when it denied a divorce.
The Dovi court acknowledged that if the court had only the jurisdiction conferred upon it by the divorce statutes, the repeal of the section authorizing the court to act when no divorce was granted took away the court's jurisdiction. Nevertheless, after carefully analyzing cases from Wisconsin and other states, the Dovi court concluded that the question of a court's powers *687 was "not so much one of divorce law" but of "equity jurisdiction." Dovi, 245 Wis. at 54.
Courts have jurisdiction in equity apart from the divorce statute to act in the best interest of a child, wrote the Dovi court. The protection of minors is one of the "well established grounds for the exercise of equity jurisdiction." Dovi, 245 Wis. at 57.[32] The repealed statute *688 "merely made applicable to divorce actions a jurisdiction which equity courts already possessed and which might have been exercised without the aid of a statute." Dovi, 245 Wis. at 57. Because the statute "did not confer jurisdiction upon the court," its repeal left the courts' equitable jurisdiction over children where it was before the statute was enacted. Dovi, 245 Wis. at 55.[33] Similarly in the case at bar, the enactment of the visitation statutes did not preempt the court's equitable jurisdiction over visitation in circumstances not included in the statutes.
The United States Supreme Court has explained the courts' equity powers over children as follows:
The general authority of courts of equity over the persons and estates of infants ... is not questioned. It may be exerted, upon proper application, for the protection of both. This jurisdiction in the English courts of chancery is supposed to have originated in the prerogative of the crown, arising from its general duty as parens patriae to protect persons who have no other rightful protector.... The jurisdiction possessed by the English courts of chancery from this supposed delegation of the authority of the crown as parens patriae is ... exercised in this country by the courts of the States.... New York Life Ins. Co. v. Bangs, 103 U.S. 435, 438 (1880).
*689 [12]
In keeping with longstanding precedent, the D.M.M. and Z.J.H. courts viewed the ch. 767 visitation statute as a legislative declaration of public policy about the rights of certain people to visitation under certain circumstances, but not as a replacement of the equitable jurisdiction of the courts over visitation and the best interest of a child. Accordingly we conclude on the basis of the history of the ch. 767 visitation statute and the case law interpreting this statute that the legislature did not intend sec. 767.245 to supplant or preempt the equitable powers of the court to protect the best interest of a child by ordering visitation under circumstances not included within the visitation statutes. Rather, the legislature intended the courts to use their equitable powers to continue the policy direction of the visitation statutes, that is, to exercise their powers for the best interest of a child when a triggering event justifies state intervention.
There is, however, one determination in Z.J.H. that gives us pause. Although the Z.J.H. court pronounced that the visitation statutes did not preempt the court's power over visitation, the court denied standing to an adoptive mother's former partner to petition for visitation on the common-law basis of an express co-parenting agreement between the two women. The court, without discussion of its equitable power, concluded that the visitation statute barred any contract concerning visitation. In support of this conclusion the court quoted Grams v. Melrose-Mindoro Jt. School Dist. No. 1 for the proposition that "[w]hen the legislative will is expressed in peremptory terms of a statute it is paramount and absolute and cannot be varied or waived by the private conventions of the parties." Z.J.H., 162 Wis. 2d at 1024 (quoting Grams v. *690 Melrose-Mindoro Jt. School Dist. No. 1, 78 Wis. 2d 569, 578, 254 N.W.2d 730 (1977)). On further reflection, we do not find this reasoning persuasive.
The Grams case is inapposite. The contract at issue in Grams required a teacher to instruct courses that she was not certified to teach when the statutes expressly declared that "[a] teaching contract with any person not legally authorized to teach the named subject ... shall be void." Section 118.21, Stats. 1971. Thus, the contract in Grams was explicitly proscribed by the statute. Nothing in ch. 767 expressly prohibits contracts relating to visitation or prohibits a court from granting visitation under circumstances not governed by the statutes.
To bolster its holding that a contract for visitation was a per se violation of the visitation statute, the Z.J.H. court also concluded that visitation agreements are unenforceable on public policy grounds. Such agreements, wrote the court, contravene "the public interest in maintaining a stable relationship between a child and his or her legal parent ...." Z.J.H., 162 Wis. 2d at 1025.
[13]
This public policy analysis is not compelling. The Z.J.H. court did not consider the 1988 statutory provision allowing a person who has established a parent like relationship with a child to petition for visitation rights when a marriage dissolves. This statutory provision states a legislative policy that courts should give effect to a biological or adoptive parent's sharing of parental rights and responsibilities with another adult. Section 767.245(1), Stats. 1991-92.
Furthermore, the Z.J.H. court relied on Stickles v. Reichardt, 203 Wis. 579, 582, 234 N.W. 728 (1931), for the rule that "in the absence of a statute, contracts of a *691 parent by which a parent attempts to transfer permanently the custody of his child to another are invalid as contrary to public policy." Z.J.H., 162 Wis. 2d at 1025. This rule does not apply in the present case. There is no assertion that Knott agreed to transfer permanently the custody of her biological child to Holtzman.[34]
[14]
Upon re-examination of Z.J.H., we conclude that public policy considerations do not prohibit a court from relying on its equitable powers to grant visitation apart from sec. 767.245 on the basis of a co-parenting agreement between a biological parent and another when visitation is in a child's best interest. We overrule any language in Z.J.H. to the contrary.

IV.
Thus, the issue before the court is whether the circuit court should exercise its equitable powers to consider Holtzman's claim that visitation is in the child's best interest.
Knott argues that, as the biological parent, she has a constitutional right to determine who shall visit her child and that this right supersedes rights asserted by *692 her child[35] or Holtzman.[36] The law does not support Knott's claim that biological or adoptive parents have absolute rights in their children.[37] The public policy of *693 the state, established by the legislature, directs the court to respect and protect parental autonomy and at the same time to serve the best interest of the child. In the 1988 amendment to the visitation statute, the legislature has also recognized the important role of a nonparent who has a parent-like relationship with a child when the child's life is disrupted by the dissolution of a marriage.
Holtzman and the guardian ad litem contend that the circuit court ought to hear the petition. Hearing Holtzman's petition for visitation would, they argue, be consistent with the policy direction of ch. 767. They assert that Holtzman has established a parent-like relationship with the child and that this relationship comports with the visitation statute. They also argue *694 that the triggering mechanism in this case, comparable to the triggering mechanisms of the ch. 767 visitation statute, is the disruption of the child's life by the elimination of his relationship with a parent-like persons. They urge that the state's intervention to act in the child's best interest is justified because, as the child's guardian ad litem asserted at oral argument, the biological mother "exercised her constitutional rights to include another adult to act as a parent"[38] but she is now substantially interfering in the child's relationship with this adult.
[15]
As we have said, we agree with the positions of the guardian ad litem and Holtzman. Mindful of preserving a biological or adoptive parent's constitutionally protected interests and the best interest of a child, we conclude that a circuit court has equitable power to hear a petition for visitation when it determines that the petitioner has a parent-like relationship with the child and that a significant triggering event justifies state intervention in the child's relationship with a biological or adoptive parent. To meet these two requirements, a petitioner must prove the component elements of each one. Only after the petitioner satisfies this burden may a circuit court consider whether visitation is in the best interest of the child.
[16]
To demonstrate the existence of the petitioner's parent-like relationship with the child, the petitioner must prove four elements: (1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child; (2) that the petitioner and *695 the child lived together in the same household; (3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation;[39] and (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.
[17,18]
To establish a significant triggering event justifying state intervention in the child's relationship with a biological or adoptive parent, the petitioner must prove that this parent has interfered substantially with the petitioner's parent-like relationship with the child, and that the petitioner sought court ordered visitation within a reasonable time after the parent's interference. The petitioner must prove all these elements before a circuit court may consider whether visitation is in the best interest of the child.
[19]
We conclude that the cause should be remanded to the circuit court to determine whether Holtzman can prove these elements.[40] If the circuit court finds, after *696 applying the four-part test we prescribe, that Holtzman has proved that she has a parent-like relationship with the child and that a significant triggering event occurred demonstrated by Knott's substantial interference with the child's relationship with Holtzman and by Holtzman's prompt petition to the court after Knott's interference, it must then determine whether visitation is in the best interest of the child.
[20]
This exercise of equitable power protects parental autonomy and constitutional rights by requiring that the parent-like relationship develop only with the consent and assistance of the biological or adoptive parent. It also protects a child's best interest by preserving the child's relationship with an adult who has been like a parent.
Support for this approach is found in the legislative policy underlying the visitation statutes and the case law of other jurisdictions, as well as in scholarly commentary.
[21]
The underlying legislative policy expressed in the three visitation statutes and the case law is to protect *697 biological and adoptive parents' constitutional right to rear their children free of unnecessary state intervention. The legislature and courts have insisted that a person petitioning for visitation under the statutes point to a triggering event to justify state intervention in a parent-child relationship. In this case, the best interest of a child may override a parent's right when a parent consents to and fosters another person's establishing a parent-like relationship with a child and then substantially interferes with that relationship. In both the visitation statutes and the approach in this case, a triggering event notifies the state that intervention into the constitutionally protected realm of parent and child might be warranted to protect a child's best interest.
The case law of other states provides further support for our decision. Other courts have recognized the importance of the establishment of a person's parent like relationship with a child based on the consent and conduct of the child's biological or adoptive parent. In facts parallel to those of this case, the New Mexico court of appeals concluded that the trial court erred in determining that an agreement concerning a child that two women had co-parented for seven years was, as a matter of law, against the best interest of the child. A.C. v. C.B., 829 P.2d 660, 664 (N.M. Ct. App. 1992), cert. denied 827 P.2d 837 (N.M. 1992).
In Karin T. v. Michael T., 484 N.Y.S.2d 780 (Fam. Ct. 1985), the biological mother's female partner signed a statement agreeing to consider the offspring of the mother's artificial insemination to be the partner's "own legitimate child." The court concluded that the partner was liable for child support based on the artificial insemination agreement, finding that "[t]he "contract and the equitable estoppel which prevail in *698 this case prevent the respondent from asserting her lack of responsibility by reason of lack of parenthood."[41]Id. at 784.
Finally, legal commentators recognize the significance of a biological or adoptive parent's consent to permit another adult to establish a parent-like relationship with a child. See Nancy D. Polikoff, This Child Does Have Two Mothers: Redefining Parenthood to Meet the Needs of Children in Lesbian-Mother and Other Nontraditional Families, 78 Geo. L.J. 459, 464 (1990) (arguing that parental autonomy and the best interests of children would be preserved by recognizing as a parent "anyone who maintains a functional parental relationship with a child when a legally recognized parent created that relationship with the intent that the relationship be parental in nature"); Comment, Kristine L. Burks, Redefining Parenthood: Child Custody and Visitation When Nontraditional Families Dissolve, 24 Golden Gate U. L. Rev. 223, (1994) (positing that a nonparent be able to seek custody and visitation when, inter alia, that person has developed a parent-child relationship with a child with the support and cooperation of the legally recognized parent).
*699 To summarize our decision, we conclude the following: Holtzman has not raised a triable issue requiring a transfer of custody, and therefore we affirm the dismissal of the custody action commenced under sec. 767.24, Stats. 1991-92. Holtzman cannot petition for visitation of Knott's child under sec. 767.245, Stats. 1991-92, but the legislature did not intend the statute to supplant or preempt the subject of visitation or the equitable powers of the court to determine visitation under circumstances not included within the statute. A circuit court may determine whether visitation with Holtzman is in the child's best interest if Holtzman first proves under the four part test that she has a parent-like relationship with the child; and if Holtzman proves a significant triggering event by demonstrating that Knott has interfered substantially with the child's relationship with Holtzman, and that Holtzman petitioned the court promptly after Knott's interference.
For the reasons set forth, that part of the order of the circuit court dismissing the petition for custody is affirmed, that part of the order dismissing the petition for visitation rights is reversed, and the cause is remanded for proceedings consistent with this opinion.
By the Court.The order of the circuit court is affirmed in part and reversed in part and the cause remanded.
WILLIAM A. BABLITCH, J.(concurring).
I join both the reasoning and the result of the majority opinion. I write to address the dissents, emphasizing that the issue in this case is not, or at least should not be, sexual orientation or sexual relationships. My focus is on the completely innocent victim in this case, and the *700 thousands of others like him: the children of dissolving non-traditional relationships. The issue is the best interests of these children, and the role of the court in protecting them.
The dissents totally ignore the access (i.e. visitation) interests of the one undisputable victim in this case, the child. Having been victimized by the dissolving relationship of the two people who raised him, the dissents would victimize the child once more by denying him any relationship with one of the two people he has come to love and cherish. It is through no fault of this child that he finds himself where he is today. Yet the dissents, two of which accuse the majority of legislating a result, themselves legislate the courts right out of any role in protecting access rights for children of dissolving non-traditional families.
The majority opinion and the dissents are in agreement with respect to one facet of this case: the legislature is silent when it comes to the access interests of the children of a dissolving non-traditional family. The dissents would leave the courts powerless in the face of this legislative silence. The dissents' unspoken but inevitable conclusion is that this legislative silence evinces a legislative intent that the best interests of these children have no protection whatsoever when it comes to access to the people who have raised them. The dissents would have us believe that the legislature intends these children to somehow engage in a societal Dickensian drift, with both the children and possibly society paying what could be an incalculable price for the errors of others. I do not believe the legislature could intend that harsh a result. Far more reasonable is the conclusion of the majority opinion that children of dissolving non-traditional families *701 have interests that can be protected by the courts in matters of access.
The majority opinion does not mandate access. To the contrary, the majority opinion leaves the decision to grant or deny visitation to the circuit court's discretionary determination of what is in the best interest of the child. That is completely consistent with the legislature's repeated admonishments to the courts that when it comes to children we must keep uppermost in our minds the best interests of the children. The dissents would lead us to believe, however, that when it comes to children of dissolving relationships the legislature is concerned only with the best interests of children of traditional families. I reject that conclusion.
I am authorized to state that Chief Justice NATHAN S. HEFFERNAN, Justice SHIRLEY S. ABRAHAMSON, and Justice JANINE P. GESKE join in this concurrence.
DAY, J. (concurring and dissenting).
I join in the very well written concurring and dissenting opinion by Justice Steinmetz. I write separately to emphasize certain points.
There is nothing in this case that warrants the deprivation of the rights of this biological mother to determine what is in her child's best interests and to decide who will and will not have visitation with her child. Neither marriage nor blood ties justifies this courts' creation of an arrangement not recognized until today. There was no marriagethe "ceremony" gone through by the mother and her former companion is a nullityit is completely unrecognized in our law. To give any importance to the "ceremony" by these two women should require an act of the legislature, not an aberrant opinion by this court.
*702 Contrary to the position taken by Ms. Holtzman's attorney in seeking visitation rights under Chapter 767 of the Wisconsin statutes, the majority recognizes, "... Holtzman is in error. Section 767.24 Stats. 1991-92, does not apply to the facts of this case. The legislature enacted the Ch. 767 visitation statute with the dissolution of marriage in mind. This case does not involve a marriage or its dissolution." Majority op. at 667. The majority opinion devotes several pages supporting that conclusion, ending its discussion of the statute as follows:
In short, the legislature did not intend the ch. 767 visitation statute to apply in the absence of the dissolution of marriage.... The circuit court appropriately refused to stretch the statute to fit in the absence of a dissolved marriage. Accordingly, we conclude that Holtzman's reliance on sec. 767.245 is misplaced.
Majority op. at 680-681.
The majority opinion should end there!
Instead, it takes the majority thirty-five paragraphs and fifteen footnotes from there on to create its new vision of family law in a way that should only be done by the legislature. Along the way, it cites many cases contrary to its new found theories. However, its only apparent purpose for doing so is so it can ignore or overrule them as is so ably discussed by Justice Steinmetz.
There is no statutory justification or provision to deny this biological mother, who with her child is an "intact family" under our prior rulings, the control over her child. In the law up until today, no one in the position of Ms. Holtzman could interfere with the right of the child's mother to determine who will visit or *703 associate with her child. As one of the present majority said recently in a concurrence in In re Angel Lace M., 184 Wis. 2d 492, 516 N.W.2d 492 (1994):
The legislators, as representatives of the people of this state, have both the right and the responsibility to establish the requirements for a legal adoption, for custody, and for visitation. This court cannot play that role. We can only interpret the law, not rewrite it.

Id. at 520 (Geske, J., concurring) (emphasis supplied). Justice Geske was right. The visitation statute is the sole means of obtaining state sanctioned visitation rights.[1] The majority disputes this fact by repeating several times that the statute does not preempt the courts' "equitable power" over visitation. The majority persists in this claim:
*704
'Till their own dreams
at length deceive `em
And oft repeating
they believe `em.
Mathew Prior (1664-1721).
The majority attempts to distinguish visitation from adoption and custody by stating that, unlike adoption and custody, this court has not expressly stated that the visitation statute supplanted the common law. This is not correct. In In re Interest of Z.J.H., 162 Wis. 2d 1002, 471 N.W.2d 202 (1991), after detailing the statutory requirements for standing under the much modified, current visitation statute,[2] this court held that a contract that purported to grant custody and visitation rights was void "[b]ecause we conclude that the legislative intent grants custody and visitation rights to non-parents only under the circumstances described above." Z.J.H., 162 Wis. 2d at 1024 (emphasis added).
Moreover, it is far from clear which direction the legislature would go if it were to examine the issue presented here. Even in countries that have legalized same-sex marriages, legislatures have restricted the rights of those couples where children are concerned. For example, Sweden, Denmark and Norway have all legalized same-sex marriages; however, the legislatures in all of these countries made it illegal for couples in same-sex marriages to adopt children or have children by artificial insemination. Lawrence Ingrassia, Danes Don't Debate Same-Sex Marriages, They Celebrate Them, Wall St. J., June 8, 1994, at A1, A8. If anything, the intent of the legislature seems to be contrary to the majority's opinion. As pointed out by *705 Justice Steinmetz, the legislature has reacted swiftly to decisions from this court with which it does not agree. Steinmetz, J., concurring and dissenting op. at 718 n.7. The most recent example is a bill already passed by the Senate, 1995 Senate Bill 13, and currently in Committee in the Assembly, which would amend the current visitation statute so that visitation may be ordered in cases with facts similar to those in In re the Marriage of Cox, 177 Wis. 2d 433, 502 N.W.2d 128 (1993) (stepparent sought standing to seek court-ordered visitation of the child of her deceased husband and his first wife). This bill is not as important to this case for what it says as it is for what it does not say. While it expresses dissatisfaction with this court's holding in Cox, if passed it would not eliminate the requirement that an action affecting the family exist for a party to gain standing nor would it in any way state disapproval with the public policy arguments that this court made in Z.J.H., 162 Wis. 2d 1002, 471 N.W.2d 202 (1991) (holding that "legislative intent grants custody and visitation rights to non-parents only under [the statute]" and stating that public policy concerns "militate against contractual provisions affecting th[e] relationship [between a natural or adoptive parent and that parent's child]."), or Angel Lace, 184 Wis.2d at 495 (holding that the Wisconsin adoption statutes did not allow a third party to adopt the minor child of the third party's same-sex nonmarital partner).
Ms. Holtzman may very well love Ms. Knott's child and feel that what she wants is in the child's best interests. But, so we must assume the same feelings and intent on the part of the child's mother.
The courts and the legislature heretofore have correctly held under similar facts that the mother is the *706 one who should make the determination of what visitation is in her child's best interests. California's Court of Appeal, First District has recently aptly summarized the reasoning behind the grant of a veto right over third party visitation to biological and adoptive parents as follows:
Providing parents a superior ability to influence the upbringing of their child is clearly in the interests of the child. By diminishing the likelihood of struggle between parents and others close to the child with whom the parents are at cross-purposes, the parental preference minimizes the likelihood the child will be exposed to hostility between those with whom he has a strong attachment, which can cause distress, create loyalty dilemmas and be disruptive to the child's socialization experiences. (Emery, Marriage, Divorce and Children (1988) at pp.94-98, and other authorities there cited and discussed.) Recent empirical studies suggest that in many instances sustained exposure to ongoing conflict may cause children more psychological distress and adjustment difficulties than separation from an attachment figure involved in the conflict. (See Johnston, Kline & Tschann, On-Going Post Divorce Conflict: Effects on Children of Joint Custody and Frequent Access, 59 Am.J. of Orthopsychiatry 576 (1989)).
In re the Marriage of Gayden, 229 Cal. App. 3d 1510, 1517 (1991).[3]
*707 Further, although the majority states that it was "mindful of preserving a biological or adoptive parent's constitutionally protected interests," majority op. at 658, in reaching its conclusion, the majority nevertheless trammels those rights. In Wisconsin v. Yoder, 406 U.S. 205 (1972), the United States Supreme Court, after acknowledging the potential for parents to act contrary to the best interests of their child, concluded that if a parent's child raising method does not "jeopardize the health or safety of the child, or have a potential for significant social burdens"the state shall not interfere. Id. at 234 (emphasis supplied).[4] The majority opinion is directly contrary to this mandate because Ms. Knott's decision to not permit Ms. Holtzman visitation rights has not been shown to have jeopardized the health or safety or to have a potential for significant social burdens on her child.[5] Thus, the *708 majority opinion unconstitutionally deprives this mother of an important right. Contrary to the majority opinion, the child here does not need the "protection of the courts." Majority op. at 659. His mother is the one who should have had the courts protecting her right to raise her own child and to determine what is in her child's best interests.
The concern expressed by Justice Bablitch is that "the dissents would victimize the child once more by denying him any relationship" with Ms. Holtzman and that the dissents leave "these children ... in a societal Dickensian drift, with both the children and possibly society paying what could be an incalculable price for the errors of others." Bablitch, J., concurring op at 700. But, this child is in no "societal drift," Dickensian or otherwise. This child is no "Oliver Twist"he is not an orphan, he has a mother. Thousands and thousands of single parents, widows and widowers from time immemorial have raised children and made the choices parents have always had to make that are part of raising, supporting and nurturing their children, including deciding with whom their child shall associate. And, they have done so without government interference. This mother has a constitutional right to do the same.
In an attempt to obscure the result oriented nature of the opinion, the majority creates four "criteria" out of whole cloth to give some legal gloss to its new creation. The majority should have taken heed of the warning given in a similar case in which a court refused to redefine the word "parent" in a visitation statute:

*709 [E]xpanding the definition of `parent' in the manner advocated by the appellant could expose other natural parents to litigation brought by child-care providers of long standing, relatives, successive sets of stepparents or other close friends of the family. No matter how narrowly we might attempt to draft the definition, the fact remains that the status of individuals claiming to be parents would have to be litigated and resolution of these claims would turn on elusive factual determinations of the intent of the natural mother, the perceptions of the children, and the course of conduct of the party claiming parental status. By deferring to the Legislature in matters involving complex social and policy ramifications far beyond the facts of the particular case, we are not telling the parties that the issues they raise are unworthy of legal recognition. To the contrary, we intend only to illustrate the limitations of the courts in fashioning a comprehensive solution to such a complex and socially significant issue.
Nancy S. v. Michele G., 279 Cal. Rptr. 212, 219 (Cal. Ct. App. 1991).
Moreover, the majority creates its law under the rubric of the "court's longstanding equitable power to protect the best interest of a child." If it is the courts and not the legislature who are to define the factual situations that "equity" requires granting visitation, everyone could have standing in any case in which they allege that the best interests of a child are at issue. That is, if the courts can, in any given case, state that the facts of a case create a "triggering event" which enables the court to exercise its "equitable powers," doesn't every case involving a child potentially come down to an amorphous "best interests" analysis regardless of the decisions made by one, or both, of the child's *710 biological or adoptive parents? Anything goes that a court may claim is "in the best interest of the child"!
The potential for this problem is highlighted in Justice Bablitch's concurrence. He states that "children of dissolving non-traditional families have interests that can be protected by the courts in matters of access." Bablitch, J., concurring op at 700. To state the proposition is to illustrate why the majority opinion is wrong. "Non-traditional family" is not defined. Is it a temporary monogamous couple of one sex or may it include a temporary heterosexual couple? May it be comprised of more than two people so as to be polygamous, and if so, how many? Do all persons claiming a "right" to visitation have to be sexually involved with the biological parent to be part of the non-raditional family or can the relationship between some or all of the adults be non-sexual? All these various living arrangements can be lumped into the term "non-traditional family." That is why the legislature should be the body that decides what groupings of adults living together may be defined as a "non-traditional family" and then define what rights a member of such an arrangement may have with the children of another member of such a "non-traditional" group.
There is no justification for a court to seek to impose in the name of the law, common or equitable, its own ideas of social policy and a new found theory of family law which creates new "rights" for those who have no legally binding relationship to the child (for instance, no duty of support). This is especially true when doing so requires overruling its own cases interpreting controlling statutory authority. Changes in family law as drastic as those created here should only be done by the legislature following full hearings and *711 debate by ninety-nine Representatives, thirty-three Senators and the Governor.
The majority opinion is a bad example of legislation by judicial fiat.
I concur with that part of the opinion dismissing the custody petition of Ms. Holtzman and dissent from that part of the opinion allowing her to seek visitation.
STEINMETZ, J. (concurring in part, dissenting in part).
The proper function of a state court is to apply the law that is declared by the popularly elected legislators of its state and of the United States, ensuring that constitutional rights are not trammeled by individuals, business entities, or the government. A state court functions at its lowest ebb of legitimacy when it not only ignores constitutional mandates, but also legislates from the bench, usurping power from the appropriate legislative body and forcing the moral views of a small, relatively unaccountable group of judges upon all those living in the state. Sadly, the majority opinion in this case provides an illustration of a court at its lowest ebb of legitimacy.
The United States Supreme Court has repeatedly recognized that under the Fourteenth Amendment to the constitution,[1] biological and adoptive parents have *712 a constitutionally protected "fundamental right" to raise their children free from unnecessary intrusion by the government.[2] In doing so, the Court has identified a "private realm of family life [into] which the state cannot enter." Barstad v. Frazier, 118 Wis. 2d 549, 568, 348 N.W.2d 479 (1984) (citing Prince v. Massachusetts, 321 U.S. 158, 166 (1944)).
The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed `essential,' `basic civil rights ...' and ... `far more precious ... than property rights.' `It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.'
Stanley, 405 U.S. at 651 (citations omitted); see also Barstad, 118 Wis. 2d at 567 (recognizing that "a natural parent has a protected right under both state law and the United States Constitution to rear his or her children free from governmental intervention").
Thus, absent narrowly defined, compelling circumstances, the legal parent of a child is constitutionally entitled to decide whether visitation by a non parent is in the best interest of the child. As the majority concedes, *713 op. at 679-680, a court may not impinge upon that right simply because it believes that visitation would be in the best interest of the child; absent compelling circumstances, the parent's decision controls. Cf. Barstad, 118 Wis. 2d at 567-68 (holding that courts should not displace a fit and able parent for a nonparent simply because the court believes the nonparent could do a better job of parenting); Quilloin v. Walcott, 434 U.S. 246, 255 (1977) (stating that "the Due Process Clause would be offended `[i]f a State were to attempt to force the breakup of a natural family ... for the sole reason that to do so was thought to be in the children's best interest'") (citation omitted); Moore v. East Cleveland, 431 U.S. 494, 502 (1977) (stating that the mere vote of a majority of a court regarding a child's best interests can be a danger to due process); Cooper v. Merkel, 470 N.W.2d 253, 255-56 (S.D. 1991) (stating that "in order to grant a nonparent visitation rights with a minor child over the wishes of a parent, a clear showing against the parent of gross misconduct, unfitness or other extraordinary circumstances affecting the welfare of the child is required").
Section 767.245, Stats., as consistently interpreted by the courts of this state,[3] sets forth the compelling circumstances that must exist before the state may interfere with a parent's decision to deny visitation to a *714 nonparent. These circumstances were first identified in Van Cleve v. Hemminger, 141 Wis. 2d 543, 415 N.W.2d 571 (Ct. App. 1987). There, the court of appeals noted that the standing requirements under sec. 767.245, Stats., were ambiguous when the statute was read in light of related statutes. After reviewing the legislative history of the statute, the court of appeals held:
It is obvious ... that the legislature did not intend that the state intervene in the parents' decisions regarding their children's best interest when the family unit is intact. We, therefore, construe the right [of visitation] created in sec. 767.245(4) [now 767.245(1)] to be limited in its application to those cases where an underlying action affecting the family unit has previously been filed.
. . .
In the absence of such factors, however, there is no justifiable reason for the state to override determinations made by parents as to what is in the best interests of their children.
Van Cleve, 141 Wis. 2d at 549. (Emphasis added.)
In 1991, the legislature reviewed the law of visitation and enacted sec. 48.925, Stats., which authorizes courts to grant reasonable visitation privileges to relatives who have maintained a relationship similar to a parent-child relationship with a child who has recently been adopted. See 1991 Wis. Act 191. The legislature enacted sec.48.925 in direct response to our decision in In re Marriage of Soergel, 154 Wis. 2d 564, 453 N.W.2d 624 (1990), in which we denied visitation to a relative under sec. 767.245(1). In enacting sec. 48.925, the legislature was cognizant of the Van Cleve decision. By not altering the decision, the legislature placed its stamp of approval on it. See In re Interest of Z.J.H., 162 Wis. 2d *715 1002, 1023, 471 N.W.2d 202 (1991) (stating that in amending the statute the legislature did not express an intent to grant visitation of a child in an intact family unit).
In Soergel, this court approvingly cited the Van Cleve court's interpretation of sec. 767.245, Stats. Shortly thereafter, this court formally adopted the Van Cleve court's requirements for seeking visitation under sec. 767.245. See Z.J.H., 162 Wis. 2d at 1022-23. Even the dissent in Z.J.H. acknowledged that "Van Cleve is a well reasoned opinion." Id. at 1032 (Bablitch, J., dissenting). Most recently, in In re Marriage of Cox v. Williams, 177 Wis. 2d 433, 502 N.W.2d 128 (1993), we again adhered to the Van Cleve court's requirements for standing, summarizing the compelling circumstances necessary for the state to intervene in a parent's decision regarding the best interests of his or her child as follows:
A person has standing to seek nonparent visitation under sec. 767.245(1), Stats., when two circumstances are present: first, an `underlying action affecting the family unit has previously been filed; and second, the child's family is nonintact, so that it may be in the child's best interests to order visitation `to mitigate the trauma and impact of [the] dissolving family relationship.'
Cox, 177 Wis. 2d at 439 (emphasis added) (citing Z.J.H., 162 Wis. 2d at 1020-23; Van Cleve, 141 Wis. 2d at 549).
In the instant case, the requisite compelling circumstances are conspicuously absent; therefore, the state should not interfere with Knott's decision to deny visitation to Holtzman, a biological stranger who is not a legal parent. Holtzman has not shown that an underlying action affecting the family has been filed, nor has *716 she shown that the family unit is dissolving or nonintact. In Cox, this court held that an intact family can consist of a biological mother and her child. Cox, 177 Wis. 2d at 440. To hold otherwise would be a loss for all single-parent families. Knott and her biological child are an intact family. By substituting their judgment for Knott's when no compelling circumstances are present, the majority infringes upon Knott's constitutionally protected right to determine what is in the best interest of her biological child and raise him free from state intervention. I acknowledge that such decisions are not always wisely made; nevertheless, absent compelling circumstances, we must respect an intact family's decisions regarding the best interests of a child.See Van Cleve, 141 Wis. 2d at 549-50.
The majority correctly concludes that Holtzman lacks standing to bring an action to obtain custody of Knott's biological child, because Holtzman has neither raised a triable issue regarding Knott's fitness or ability to parent her child, nor shown compelling circumstances requiring a change of custody. Majority op. at 664-666, 687. The majority states that "[t]he concept of `standing' is used in custody actions to mean that the petitioner `has status to bring an action for custody under the applicable statute.'" Majority op. at 664 (quoting Z.J.H., 162 Wis. 2d at 1008 n.3) (emphasis added). Thus, with respect to custody actions, the majority acknowledges that circuit courts are bound by the law as declared by the legislature of this state.
However, with respect to visitation actions, the majority opines that circuit courts may disregard the applicable statute and invoke their "equitable power" to order visitation. The majority reasons that sec. 767.245, Stats., applies only when a "marriage" is dissolving. Majority op. at 680-681. Holtzman and Knott *717 are not legally married, nor could they be under the laws of this state.[4] Hence, according to the majority, the statute does not apply to this case. Majority op. at 680-681.
In fact, the statute does apply to this case. It simply does not yield the result desired by the majority. The statute unequivocally applies to a person, such as Holtzman, "who has maintained a relationship similar to a parent-child relationship with the child." Section 767.245, Stats.[5] As stated earlier, the courts of this state have consistently interpreted the statute and held that a person lacks standing to bring a visitation action unless an underlying action affecting the family has been filed and the family is dissolving. Cox, 177 Wis. 2d at 439; Z.J.H., 162 Wis. 2d at 1020-23; Van Cleve, 141 Wis. 2d at 549. Section 767.02(1),[6] lists various *718 actions "affecting the family." Most of these are actions involving the dissolution of a marriage. The break-up of a non-legally protected, non-traditional relationship is not listed as an action affecting the family. This is not an oversight on the part of the legislature.
The legislature is presumed to be aware of this court's decisions interpreting the visitation statute and, thus, is presumed be aware that in order to have standing in a visitation action, a nonparent must show that an action affecting the family has been filed. Z.J.H., 162 Wis. 2d at 1023 (citing Zimmerman v. Wisconsin Elec. Power Co. 38 Wis. 2d 626, 634, 157 N.W.2d 648 (1968)). If the legislature had intended to allow visitation in a case such as this, it could very easily have inserted a provision into sec. 760.02, Stats., stating that an action affecting the family includes the break-up of a non-legally protected and non-traditional relationship or the severing of an implicit child-rearing agreement between two non-married people. The legislature did not do so.[7]
*719 Both this court and the United States Supreme Court have previously stated that the "usual understanding of `family' implies biological relationships, and most decisions treating the relation between parent and child have stressed this element." Cox, 177 Wis. 2d at 440 (quoting Smith v. Organization of Foster Families, 431 U.S. 816, 843 (1977)). Again, the legislature is presumed to be aware of our prior decisions and of those by the Supreme Court. The legislature could have easily inserted a provision into sec. 767.001, Stats. (definitions), broadly defining the term "family" to include non-legally protected, non-traditional relationships. The legislature did not do so. Instead, consistent with the usual understanding of "family," the legislature has expressed a clear intent to promote and protect only those relationships with a biological, adoptive, or marital connection.
*720 In a decision authored by Justice Abrahamson, this court reiterated that "[i]t is the intent of chs. 765 to 768 to promote the stability and best interests of marriage and the family .... Marriage is the institution that is the foundation of family and society. Its stability is basic to morality and civilization, and of vital interest to society and the state." Watts v. Watts, 137 Wis. 2d 506, 518-19, 405 N.W.2d 305 (1987) (emphasis in original) (quoting sec. 765.001(2), Stats.). Continuing, the court stated that "the legislature not only intended chs. 765-68 to protect and promote the `family,' but also intended `family' to be within the `marriage' context." Id. at 519. In light of the fact that Wisconsin does not recognize marriages between individuals of the same sex, it seems implausible to suggest that the legislature intended to recognize such relationships as a family unit.
This does not mean, as the concurrence suggests, that I believe the legislature is concerned only with the best interests of children of traditional families. It simply means that the legislature has determined, consistent with the constitutional rights of biological parents, that when two people terminate a nontraditional relationship in which a child has been raised, the biological parent is entitled to determine whether it is in the best interest of the child to continue seeing the biological stranger.
The legislators of this state, representing the views of their constituents, have consciously decided not to protect or promote non-traditional, non-legally binding relationships, apparently believing that such relationships are not basic to morality and civilization.[8] Accordingly, the break-up of such a relationship *721 cannot be deemed a "triggering event" sufficient to justify impinging upon a biological parent's constitutional right to raise his or her child free from state intervention. Then majority disagrees with this legislatively declared social policy and, therefore, rewrites the law to reflect its own moral views and to facilitate its predetermined legal conclusion.
The majority concludes that "the legislature did not intend sec. 767.245 either to be an exclusive grant of power to the courts to determine visitation or to limit the courts' equitable power to protect the best interest of a child by ordering visitation." Majority op. at 681. The majority provides three unsatisfactory justifications for its conclusion.
First, the majority notes that on at least two occasions, this court granted visitation before the visitation statutes were promulgated. Majority op. at 681. Because the court's power to grant visitation is not statutory in origin, the majority concludes that its power over visitation is not limited by the existing visitation statutes. Majority op. at 682. However, the fact that courts exercised a self-bestowed power to order visitation at a time when no statutes were in existence does not mean that courts now have the power to order visitation when doing so is contrary to existing statutes. As discussed above, ordering visitation in this case is contrary to sec. 767.245, Stats.
Second, the majority reasons that nothing in the visitation statutes or their legislative history states or implies that they were intended to displace the courts' "equitable power" over visitation. Majority op. at 682. The majority then concludes that because the visitation statutes provide for visitation only under limited *722 circumstances, it is reasonable to infer that courts may order visitation under other circumstances. Majority op. at 682. This is absurd. The statutes provide for visitation only under limited circumstances because biological and adoptive parents have a constitutionally protected right to raise their children free from unnecessary governmental intrusion. The statutes seek to draw an appropriate line between necessary and unnecessary governmental intrusion. Nevertheless, the majority, in its desire to reach a result, seeks to redraw that line, giving courts the amorphous authority to grant visitation to a nonparent over objection by a biological parent, under circumstances that the legislature has deemed unnecessary, inappropriate, and unconstitutional.
Third, the majority states that this court recently reaffirmed its equitable power to order visitation. Majority op. at 685 (citing D.M.M., 137 Wis. 2d 375, Z.J.H., 162 Wis. 2d 1002). The majority correctly notes that in D.M.M., this court stated that certain language in the visitation statute was intended to supplement common law rights of nonparents to petition for visitation. In D.M.M., 137 Wis. 2d at 386, the court was grappling with an ambiguity in the statute. In making the statement quoted by the majority, the D.M.M. court sought to ensure that decisions made under common law would continue to serve as a guide in interpreting ambiguities in the statute. See id. at 389. The court did not mean to suggest that courts have authority to ignore the constitutionally based standing restrictions of the visitation statute.
Unlike the situation in D.M.M., no one is claiming that the statute as applied to this case is ambiguous. Under the statute, persons who have maintained a relationship similar to a parent-child relationship with *723 the child may seek visitation if they meet the requirements for standing, as originally stated in Van Cleve and followed by this court in Z.J.H. and in Cox. As discussed above, Holtzman lacks standing to seek visitation.
The majority also notes that the D.M.M. court stated that the visitation statute seeks to clarify that nonparents "have a right recognized by statute that is not subject to developing and changing common law." Id. at 387. The majority apparently quotes this language for the proposition that although courts may not take away right guaranteed to nonparents by the statute, courts may give nonparents greater access to visitation than is granted by the statute. However, the visitation statute, through its restrictions on visitation, also seeks to protect the constitutionally guaranteed rights of biological and adoptive parents to raise their children free from unnecessary state intervention. The majority fails to recognize that by granting greater rights of visitation to nonparents, it is necessarily decreasing and impinging upon the constitutionally guaranteed rights of biological and adoptive parents. Cf. Z.J.H., 162 Wis. 2d at 1015 (stating that "to the extent that we award custody rights to [a nonparent], we diminish the rights of legal parents"). No court has ever suggested that a nonparent has a constitutionally protected right to visitation of a child when visitation conflicts with the wishes of the biological parent. See id. If one of two competing rights must give way, it should be the one that is not constitutionally protected.
The majority also points to Z.J.H. for the proposition that courts in this state have equitable power to order visitation. Majority op. at 686. However, it subsequently contradicts itself, stating that Z.J.H. "gives us pause" in concluding that courts maintain equitable *724 power to order visitation under circumstances not specified in the visitation statutes. Majority op. at 689. The majority then purports to overrule Z.J.H., stating that upon further reflection, the reasoning of that case is not persuasive.[9]
The majority finds the reasoning of Z.J.H. unpersuasive because it prevents the majority from reaching its predetermined legal conclusion. The policy and law of this state have not changed within the last four years, but the complexion of the court has and, apparently, the new majority does not place much stock in the doctrine of stare decisions.
Z.J.H. is troubling for the majority because the facts in that case are strikingly similar to the facts in this case. In Z.J.H., two women, Hermes and Sporleder, lived together as companions for approximately eight years. After an unsuccessful attempt at artificial insemination of Sporleder, they decided that Hermes would adopt a child. Z.J.H. Was born and shortly thereafter was placed in their home as a preadoptive placement. Hermes continued to work outside the home, while Sporleder provided the primary care for Z.J.H. The parties entered into a coparenting agreement, where by they agreed that if they separated the person without custody would have liberal visitation rights to Z.J.H. Approximately one year later, the parties *725 separated. Subsequently, Hermes formally adopted Z.J.H. and prohibited Sporleder from seeing Z.J.H.
Although the Z.J.H. court discussed its prior decision in D.M.M., the court did not state or imply that courts have equitable power to order visitation under other circumstances not declared by the legislature. In fact, the court stated just the opposite and held that Sporleder, the nonparent, lacked standing to seek visitation.
The rationale behind [Van Cleve and Soergel] was that the legislature did not intend to override a parent's determination of visitation unless an underlying action affecting the family unit had been filed, because in such an instance, ordering visitation with non-parents may help to mitigate the trauma and impact of a dissolving family relationship. Soergel, 154 Wis. 2d at 571-72; Van Cleve, 141 Wis. 2d 549. The presence of an intact family unit merely signals the absence of a dissolving family relationship.
In this case, whether the conclusion results from (a) the characterization of Hermes and Z.J.H. as an `intact family unit,' or (b) the absence of an underlying action affecting the family unit, the same result occurs: there is no authority for Sporleder to petition for visitation rights.

. . . .
[R]ights to custody and visitation are controlled by statutory and cases law, and cannot be contracted away. `When the legislative will is expressed in peremptory terms of a statute it is paramount and absolute and cannot be varied or waived by the private conventions of the parties. Grams v. Melrose-Mindoro Jt. School Dist. No. 1, 78 Wis. 2d 569, 578, 254 N.W.2d 730 (1977). Because we conclude that *726 the legislative intent grants custody and visitation rights to non-parents only under the circumstances described above, the contract is void to the extent it purports to award custody or grant visitation rights to Sporleder.
Z.J.H., 162 Wis. 2d at 1022-24 (emphasis added). The reasoning in Z.J.H. is sound. The court appropriately applied and followed the law of visitation in this state.
Not only does the majority opinion ignore legislative intent and precedent from this court, it also removes the lid from Pandora's infamous box. Indeed, how far does a court's equitable power extend? If courts have equitable power to order visitation under circumstances not specified by statute, then why do they not have equitable power to order custody under circumstances not specified by statute. The majority concludes that "[t]he adoption and custody statutes ... are different from the visitation statutes in regard to preemption" because this court has expressly stated that adoption and custody are governed solely by statutory law. Majority op. at 683-684. However, I can find no distinguishing language in the visitation, adoption, and custody statutes that even suggests that the legislature did not intend to occupy the field of visitation, but did intend to occupy the fields of adoption and custody. The "it is so because we say it is so" reasoning employed by the majority is another example of the majority writing the law to facilitate its desired result.
After emasculating the statutory law of visitation, the majority invents new requirements for standing that must be satisfied before a circuit court can exercise its equitable power to hear a petition for visitation.[10] Majority opp. at 694-695. First, the petitioner *727 must show that he or she has a parent-like relationship with the child. Majority op. at 694. Under the majority's requirements for establishing such a relationship, live-in boyfriends, live-in girlfriends, long-term house guests, and others who live in the child's household could conceivably and easily qualify.[11]
Second, the petitioner must identify a significant triggering event that justifies state intervention in the child's relationship with a biological or adoptive parent. Majority op. at 695. According to the majority, the petitioner can identify a significant triggering event by *728 showing that the biological or adoptive parent has substantially interfered with the petitioner's parent-like relationship with the child, and that the petitioner sought court-ordered visitation within a reasonable time after the parent's interference. Majority op. at 695. This is a meaningless requirement. If two parties are disputing over visitation rights, the legal parent nearly always has "interfered" with the petitioner's parent-like relationship with the child. Thus, unless the petitioner has failed to promptly seek court-ordered visitation, he or she will always have standing. If a biological parent decides that he or she does not want a biological stranger to see the child anymore, the biological parent should have the right to make that decision. Under the court's lax requirements for standing, the parent may not have that right. The majority's opinion has left the concept of "parental autonomy" with very little meaning.
I am troubled by the fact that the majority has created a new area of family law that has standards that are lower than the legislatively declared family law of this state. Nearly every person who lives in the child's household could satisfy the majority's standing requirement. Thus, the majority's "triggering event" boils down to little more than a best interests test. As stated above, both this court and the United States Supreme Court have held that a court may not infringe upon a parent's constitutionally protected right to decide who visits the child simply because the court believes that visitation would be in the best interest of the child. Thus, the majority's "triggering event" violates Knott's due process rights as guaranteed by the Fourteenth Amendment to the United States Constitution.[12]
*729 Parents, not the courts, should determine whether visitation is in their children's best interests.
Wisconsin now has two areas of family law, and persons seeking visitation can apparently choose the area that best suits them. One area of family law is declared by the legislature, representing the will of the people of this state. The other area of family law is declared by four justices of this court, representing only their own wills and moral views. As Justice Geske so recently and so aptly stated: "The legislators, as representatives of the people of this state, have both the right and the responsibility to establish requirements for a legal adoption, for custody, and for visitation. This court cannot play that role. We can only interpret the law, not rewrite it." Angel Lace M., 184 Wis. 2d at 520, (Geske, J., concurring). Rewriting the law is precisely what the majority does in this is case. This is truely a case of the judiciary functioning at its lowest ebb of legitimacy.
For these reasons, I concur with that part of the opinion denying custody and dissent from that part of the opinion relating to visitation.
I am authorized to state that Justice ROLAND B. DAY joins this concurring and dissenting opinion.
WILCOX, J. (concurring in part; dissenting in part).
I agree with the majority in this case that the *730 circuit court properly concluded that Knott was entitled to summary judgment concerning the custody action commenced under sec. 767.24(3), Stats.
I disagree with the majority, however, as to its conclusion that the ch. 767 visitation statutesec. 767.245, Statsdoes not apply to Holtzman's petition for visitation rights to Knott's biological child. I believe that the legislature intended that circuit courts' powers regarding visitation were to be derived exclusively from sec. 767.245. Further, in reviewing and applying the cases construing sec. 767.245 to the facts at hand, I can only conclude that the circuit court was correct in determining that Holtzman's petition for visitation rights for H.S. should be dismissed. My conclusion that Holtzman should not have the right to petition for visitation in this case is not reached easily, as this case presents emotionally charged issues. Nonetheless, I believe that by recognizing Holtzman's right to petition in this case, this court is usurping the proper functioning of the legislature.
Section 767.245, Stats., provides:
Visitation rights of certain persons. (1) Upon petition by a grandparent, great-grandparent, stepparent or person who has maintained a relationship similar to a parent-child relationship with the child, the court may grant reasonable visitation rights to that person if the parents have notice of the hearing and if the court determines that visitation is in the best interest of the child.
(2) Whenever possible, in making a determination under sub. (1), the court shall consider the wishes of the child.
Under the majority's analysis, the events triggering application of this statute only "relate to the dissolution *731 of a marriage." Majority op. at 680-681. Because "[t]he child in this case was not born of a marriage or adopted during a marriage, and his biological mother has not been married during his life," the majority concludes that the legislature did not intend sec. 767.245 to apply under the facts of this case. I believe that the majority's conclusion that the statute does not apply in this case is erroneous.
First and foremost, sec. 767.245, Stats., is titled "Visitation rights of certain persons." A reasonable person would read this to mean that an individual seeking visitation of a child would necessarily proceed thereunder. In fact, Holtzman specifically filed a petition under sec. 767.245.[1] Further, there can be no dispute that Holtzman has maintained a relationship with H.S. "similar to a parent-child relationship." In my mind, sec. 767.245 clearly applies to the facts of this case.[2]
*732 As the majority implicitly recognizes, once it is established that sec. 767.245, Stats., controls, it becomes clear that Holtzman lacks standing to petition for visitation. This is so because our cases interpreting sec. 767.245 have consistently held that a person lacks standing to bring a visitation petition absent an underlying action "affecting the family unit" as well as a dissolving family unit. As we explained in Cox v. Williams, 177 Wis. 2d 433, 439, 502 N.W.2d 128, 130 (1993):
A person has standing to seek nonparent visitation under sec. 767.245(1), Stats., when two circumstances are present: first, an "underlying action affecting the family unit has previously been filed"; and second, the child's family is nonintact, so that it may be in the child's best interests to order visitation "to mitigate the trauma and impact of [the] dissolving family relationship."
See also In re Interest of Z.G.H., 162 Wis. 2d 1002, 1022, 471 N.W.2d 202, 212 (1991); Van Cleve v. Hemminger, 141 Wis. 2d 543, 546, 415 N.W.2d 571, 573 (Ct. App. 1987).
The question in the present case thus becomes two-pronged: (1) whether an underlying action affecting the family unit has been filed; and (2) whether the family unit is dissolving. My interpretation of the applicable statutes and case law leads me to conclude that both inquiries must be answered in the negative.
Section 767.02, Stats., sets forth what the legislature considered to be "actions affecting the family." Among those actions listed are divorce, legal separation, *733 and annulment. See Section 767.02(1), Stats. The statute makes no reference to the dissolution of relationships involving bonds between same sexed individuals. Holtzman herself recognizes that her separation from Knott does not fall into any of the listed actions. Petitioner's brief at 18. She asserts, however, that the separation was a de facto divorce and should therefore be recognized as an action affecting the family. This is a question whose resolution is particularly within the province of the legislature. Because I believe Holtzman's petition for custody/visitation is not an action affecting the family, she has failed on the first prong.
As to the second prong, there is no dispute that the unit comprising Holtzman, Knott, and H.S. is dissolving. Considering the time and energy spent on fostering the growth of this unit, its dissolution is no small matter. The question, however, is whether this unit is a "family unit" within the meaning of Wisconsin law. I think not. Holtzman and Knott are not (nor could they ever be under the current state of law) a legally married couple. Further, H.S. is not the biological son of Holtzman. Finally, Holtzman is not an adoptive parent of H.S. See In Interest of Angel Lace M., 184 Wis. 2d 492, 516 N.W.2d 678 (1994). These facts indicate that Holtzman, Knott, and H.S. are not a dissolving "family unit" as that term is to be construed for purposes of ch. 767. Further, as this court recognized in Cox, an intact family can consist of a biological mother and her child. Cox, 177 Wis. 2d at 440, 502 N.W.2d at 130. Here, there is no dispute that Knott is the biological mother of H.S. Thus, Holtzman has also failed under the second prong.
In sum, while I recognize the troubling aspects of this case, I nonetheless believe that the current state of *734 the law does not allow Holtzman standing to petition for the visitation of H.S. I believe that the majority has entered into the realm of the legislature and that it should defer to that body on this issue. As we previously have noted, "[t]his court does not sit as a superlegislature debating and deciding upon the relative merits of legislation." Coffee-Rich, Inc. v. Department of Agriculture, 70 Wis. 2d 265, 269, 234 N.W.2d 270, 272 (1975); see also Laskaris v. City of Wisconsin Dells, Inc., 131 Wis. 2d 525, 534, 389 N.W.2d 67, 71 (Ct. App. 1986) ("The judiciary is not, however, a superlegislature.")
For the reasons set forth above, I concur in part and dissent in part with the majority opinion.
NOTES
[1] The two questions of law arise in an appeal from an order granting Knott's motion for summary judgment. Summary judgments are governed by sec. 802.08, Stats. 1991-92, and this court reviews the circuit court's order for summary judgment by applying the same methodology as the circuit court. Green Spring Farms v. Kersten, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987).
[2] A petitioner's contribution to a child's support need not be monetary.
[3] We do not by this opinion mean to interpret what conditions satisfy the statutory requirement of "a relationship similar to a parent-child relationship with the child" in sec. 767.245(1).
[4] The circuit court denied Holtzman's and the guardian ad litem's requests for relief pending appeal, specifically the right to exercise visitation. On December 23, 1993, the court of appeals granted Holtzman's request for visitation while the appeal was pending and directed the circuit court to establish a visitation schedule. On December 24, 1993, Knott filed a petition for a writ of prohibition with this court to prevent the circuit court from ordering temporary visitation. On January 6, 1994, this court directed the circuit court to hold the planned hearing to determine a visitation schedule but to stay the implementation of the visitation schedule until this court had considered Knott's petition. On February 3, 1994, this court denied the petition for a writ of prohibition and lifted the previously imposed stay on visitation.
[5] Holtzman sought access to Knott's mental health records to support her claims of Knott's unfitness or compelling circumstances, relying on sec. 802.08(4), Stats. 1991-92, which provides as follows:

Should it appear from the affidavits of a party opposing the [summary judgment] motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the motion for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just. (Emphases added.)
Section 802.08(4) grants the circuit court discretion to permit affidavits to be obtained or discovery to be had. On the basis of this record we cannot conclude that the circuit court erroneously exercised its discretion in refusing to give Holtzman access to privileged mental health records.
[6] Santosky v. Kramer, 455 U.S. 745 (1982); Prince v. Massachusetts, 321 U.S. 158 (1944), reh'g denied, 321 U.S. 804 (1944); Pierce v. Society of Sisters, 268 U.S. 510 (1925); Meyer v. Nebraska, 262 U.S. 390, 399 (1923).

This court has said that "[u]nder ordinary circumstances, a natural parent has a protected right under both state law and the United States Constitution to rear his or her children free from governmental intervention." Barstad, 118 Wis. 2d at 567 (cited with approval in Z.J.H., 162 Wis. 2d at 1015, and Cox v. Williams, 177 Wis. 2d 433, 440, 502 N.W.2d 128 (1993)).
See Developments in the Law, The Constitution and the Family, 93 Harv. L. Rev. 1156, 1351-1357 (1980).
[7] Outside these two statutes, courts continued to determine, without statutory direction, the visitation rights of other persons, including non-custodial parents.

It appears that only one other statute mentioned visitation in 1975the Uniform Child Custody Jurisdiction Act defining custody to include visitation for purposes of that act. Section 822.02(2), Stats. 1975.
[8] Ch. 122, Laws of 1975.
[9] The visitation statute nevertheless remained in chapter 247, entitled "Actions Affecting Marriage."
[10] "It is the intent of the legislature to emphasize the present and future needs of the parties to actions affecting marriage and of their children, if any ...." Section 1, ch. 105, Laws of 1977.

The 1977 bill created ch. 247 entitled "Actions affecting Marriage." Section 247.02(1), Stats. 1979, declared that "actions affecting marriage" are:
(a) To affirm marriage.
(b) Annulment.
(c) Divorce.
(d) Legal separation...
(e) Custody.
(f) For child support.
(g) For maintenance payments.
(h) For property division.
(i) To modify a judgment in an action affecting marriage granted in this state or elsewhere.
(j) For periodic family support payments.
[11] The Wisconsin Legislative Council, which was instrumental in formulating the 1977 Divorce Reform Act, characterized the 1977 statute as "retain[ing] the statute allowing the court to award visitation rights to a grandparent where that is in the child's best interests, and expands it to include great-grandparents as well." The Divorce Reform Act (Chapter 105, Laws of 1977), Wis. Leg. Council Staff Information Memo 78-9 at 8 (April 18, 1978; revised June 22, 1978) (first emphasis added).

See also analyses of 1983 Wis. Act 450 discussing sec. 767.245 and viewing court-ordered visitation as limited to actions affecting the family. Bill drafting files, microfiche, Wis. State Law Library.
[12] Chapter 247 was renumbered ch. 767. Section 50, ch. 32, Laws of 1979.
[13] 1987 Wis. Act 355.
[14] Comments1987 Act 355, sec. 767.245, West's Wis. Stats. Ann. (1993).
[15] The Legislative Council's Special Committee on Custody Arrangements was created to study existing laws relating to custody determinations in divorce or related actions. Minutes of Aug. 15, 1984.
[16] The Note to the committee's legislative declaration illustrates the emphasis on dissolution of marriage: "the basic concept underlying many of the changes in this bill [is] that it is generally in the best interest of a child to have a close, continuing relationship with both parents where the parents have divorced or separated." Sec. 1, 1987 Wis. Act 355.
[17] In discussing visitation rights of nonparents, the Information Memorandum states: "Existing law did not recognize the importance to the child of continuing contact with stepparents or other persons with whom the child has lived in a parentchild type relationship. The Special Committee found that there are currently many cases in which a nonparent who has had a close, meaningful relationship with a child during the parents' marriage is denied an opportunity to even petition for visitation rights with that child after the parents are divorced or separated." Wis. Leg. Council Staff Information Memo 88-5 at 8 (May 3, 1988) (emphasis added).
[18] The legislative findings pronounced at the beginning of 1987 Wisconsin Act 355 state that "the current laws and practices relating to child custody determinations in divorce and other actions affecting the family ... [f]ail to recognize the importance to the child of continuing contact with ... persons with whom the child has lived in a relationship similar to a parent-child relationship." (Emphasis added.)
[19] 1991 Wis. Act 191. Section, 48.925, Stats. 1991-92, provides as follows: "[U]pon petition by a relative who has maintained a relationship similar to a parent-child relationship with a child who has been adopted by a stepparent or relative, the court may grant reasonable visitation rights to that person if [certain requirements are met]."

This statute was designed to overrule that part of In re Marriage of Soergel, 154 Wis. 2d 564, 453 N.W.2d 624 (1990), which related to adoption.
[20] The ch. 767 visitation statute also applies to paternity suits. Section 767.51(6) instructs that a court may order visitation under sec. 767.245 when it enters a paternity judgment or order. No other statute expressly identifies an event triggering the application of the ch. 767 visitation statute.
[21] In 1979, the legislature had substituted the phrase "actions affecting the family" for the previously used phrase "actions affecting marriage." Section 19, ch. 352, Laws of 1979.

At the time Van Cleve was decided, sec. 767.02(1), Stats. 1985-86, defined "actions affecting the family" to include actions "[c]oncerning visitation rights to children." Section 767.02(1)(k), Stats. 1985-86.
In Van Cleve, the court of appeals implicitly decided that a grandparent's petition for visitation, although included in the statutory definition of an action affecting the family, did not suffice as an underlying action affecting the family.
[22] This case involved the 1977 ch. 247 visitation statute. The Soergels petitioned for visitation three months prior to the effective date of the 1988 amendments to that statute.
[23] In Z.J.H., the court implied that a CHIPS proceeding would suffice as an action affecting the family. Z.J.H., 162 Wis. 2d at 1020. The court cited no authority for this statement.
[24] The three dissenters in Cox, like the court of appeals, concluded that there were three possible underlying actions affecting the familythe divorce action between the child's biological parents, the action by the child's biological mother to modify the divorce judgment, and the biological mother's custody action.

The majority in Cox viewed the divorce action as having terminated at the father's death and, without explanation, refused to consider visitation within the custody action. While the ch. 767 visitation statute recognizes stepparents' right to visitation, the majority suggested that only a divorce or separation action between the stepmother and biological father would suffice as a prerequisite to the stepmother's petitioning for visitation under sec. 767.245, Stats. Cox, 177 Wis. 2d at 441.
In the case at bar, Holtzman filed a petition for custody and Knott' has sought an injunction. Holtzman views both of these proceedings as underlying actions affecting the family.
[25] We have previously noted that "[t]he legislature has failed to provided any definition for `family' under ch. 767, or for that matter under any chapter of the Family Code." Watts v. Watts, 137 Wis. 2d 506, 515-16, 405 N.W.2d 303 (1987) (footnote omitted).

The United States Supreme Court has acknowledged "considerable difficulty" in defining "family." The Court noted that "biological relationships are not [the] exclusive determination of the existence of a family" and stated that "the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association and from the role it plays in `promot[ing] a way of life' through the instruction of children." Smith v. Organization of Foster Families, 431 U.S. 816, 842-844 (1977) (quoting Wisconsin v. Yoder, 406 U.S. 205, 231-33 (1972)).
[26] Chapter 767 ordinarily does not apply unless there is a marriage or the dissolution of a marriage. See Watts v. Watts, 137 Wis. 2d 506, 518-19, 405 N.W.2d 305 (1987) (holding that the Family Code, of which ch. 767 is an integral part, "applies, for the most part, to those couples who have been joined in marriage according to law").

Holtzman and Knott were not married and could not marry under the laws of this state. The biological father of Knott's child, an anonymous sperm donor, did not marry Knott and has not developed any relationship with the child.
[27] As precedent for its decision, the court relied on Gotz v. Gotz, 274 Wis. 472, 80 N.W.2d 359 (1957) (allowing visitation by the noncustodial mother's two sisters and their husbands), and Peterson v. Peterson, 13 Wis. 2d 26, 108 N.W.2d 126 (1961) (declaring that the difficulty and hardship of a parent in exercising visitation rights must be subordinated to the welfare of the child).
[28] According to a Legislative Reference Bureau analysis, the 1975 precursor to the ch. 767 grandparent visitation statute "codifies the authority of the court in actions affecting marriage to grant visitation privileges to grandparents where it is in the best interest of the child." Drafting Record, 1975 S.B. 1311, Wisconsin State Law Library.
[29] Sections 48.925 (visitation on adoption), 767.245 (visitation on dissolution of marriage), and 880.155 (visitation on death of parent) direct that the court shall consider and act in the best interest of the child. See also secs. 767.24(5) (best interest of the child in custody and physical placement) and sec. 767.25(2) (best interest of the child in child support).
[30] The statutes, including but not limited to ch. 48 (the Children's Code), secs. 767.02(1)(e) and 767.24, and ch. 880 (Guardians and Wards), Stats. 1991-92, regulate custody proceedings whether in a judgment of annulment, divorce or legal separation, in a judgment in a separate custody action not dependent on marriage or dissolution of marriage, in a ch. 48 proceeding, or in a guardianship proceeding.
[31] In re Custody of D.M.M., 137-Wis. 2d 375, 404 N.W.2d 530 (1987), is silent about the need for an underlying action to justify a visitation claim. The underlying action may have been a custody or a guardianship proceeding. D.M.M., 137 Wis. 2d at 379. The petition may also have been filed after the divorce of the child's parents because the opinion describes the father as the mother's "husband at the time [of the child's birth]."
[32] See also State ex rel. Friedrich v. Circuit Court for Dane County, 192 Wis. 2d 1, 18, 531 N.W.2d 32 (1995) (courts have the "duty to protect minors who appear before them"); Romasko v. Milwaukee, 108 Wis. 2d 32, 37, 38, 321 N.W.2d 123 (1982) ("minors are the special objects of the solicitude of the courts ... [the court has the] governmental function of seeing to it that justice is done to those who are defenseless and who are the objects of the special concern of government"); Stevenson v. Milwaukee County, 140 Wis. 14, 17, 121 N.W. 654 (1909) (circuit courts have, by constitution, powers of law and equity and "do not depend solely upon statute for their powers"); Harrigan v. Gilchrist, 121 Wis. 127, 231, 99 N.W. 909 (1904) ("the circuit courts of this state have, under the constitution, succeeded to all the jurisdiction formerly exercised by courts of law and courts of chancery as well"); Richardson v. Tyson, 110 Wis. 572, 578, 86 N.W. 250 (1901) ("the infant is always the award of every court wherein his rights or property are brought in jeopardy, and is entitled to most jealous care that no injustice be done to him").

For other state courts reaching similar conclusions about the courts' equitable powers over children, see, e.g., Parker v. Parker, 81 N.E.2d 745, 748 (Ill. Ct. App. 1948) (courts of equity have plenary jurisdiction over minors); Metten v. Benge, 366 N.W.2d 577, 579 (Iowa 1985) (action between unmarried cohabitants about care of child supports exercise of equity jurisdiction); Wentzel v. Montgomery General Hospital, Inc., 447 A.2d 1244, 1253 (Md. 1982), cert. denied 459 U.S. 1147 (1983) (court of equity may consider petition to sterilize a minor under inherent power); Stambaugh v. Price, 532 S.W.2d 929, 932 (Tenn. 1976) (chancery court has inherent jurisdiction to act in relation to the property and other interests of minors).
[33] See also In Matter of Guardianship of Eberhardy, 102 Wis. 2d 539, 548-51, 557-60, 307 N.W.2d 881 (1981) in which six justices concluded that although the legislature did not authorize sterilization, circuit courts have the power under the state constitution to entertain a petition for sterilization of an incompetent person; repeal of the sterilization law left the court's jurisdiction untouched.
[34] Moreover, Stickles favors, in some circumstances, the enforcement of a parent's agreement relating to the care of the child:

Where a parent has voluntarily contracted away his rights and the child as a result has formed new attachments, it may very well be that a situation has been created which a court will hesitate to disturb, not on the principal ground that the contract was valid or invalid, but because, everything considered, the welfare of the child demands the continuance of the new relationship.
Stickles, 203 Wis. at 583.
[35] Holtzman argues that the child, a nonmarital child because Knott and Holtzman cannot marry, is denied equal protection of the law.

Holtzman and the guardian ad litem also assert (1) that the child has a liberty interest in continuing his relationship with both parties and in avoiding the harm from separation from one of them and (2) that the circuit court's decision interferes with this liberty interest, depriving the child of substantive due process.
For a discussion of the constitutional argument from the child's vantage point, see In Interest of Angel Lace M., 184 Wis. 2d 492, 537 n.13, 516 N.W.2d 678 (1994) (Heffernan, C.J. dissenting).
[36] Holtzman claims that, "as a member of a unitary family" although not biologically related to the child, she has a constitutionally protected right to seek custody of or visitation with the child. The United States Supreme Court, she explains, has favored an established family-type relationship over a biological bond in Michael H. v. Gerald D., 491 U.S. 110 (1989), and Lehr v. Robertson, 463 U.S. 248 (1983).
[37] This court has allowed a nonparent to have visitation rights with a child over the objections of the custodial parent in a case arising more than 30 years after the United States Supreme Court announced that parents have a protected liberty interest in rearing their children. In Gotz v. Gotz, 174 Wis. 2d 472, 80 N.W.2d 359 (1957), the court upheld the trial court's order granting visitation to two maternal aunts, against the wishes of the biological father who had custody of the child.

There is little uniformity in the case law concerning nonparental visitation over the objection of a biological or adoptive parent, but some courts have observed a judicial trend toward considering or allowing visitation to nonparents who have a parent-like relationship with the child if visitation would be in the best interest of the child. See, e.g., In the Matter of Adoption of Francisco A., 866 P.2d 1175, 1179 (N. Mex. Ct. App. 1993) (granting visitation to foster parents in adoptive situation); In re Robin N., 7 Cal. App. 4th 1140, 1146 (Ct. App. 1992) (granting visitation to nonparent who had a parent-like relationship with the child against wishes of parents); In re Hirenia C., 18 Cal. App. 4th 504, 519 (Ct. App. 1993) (granting visitation to nonparent who had parent-child relationship with adopted child); Annot., Visitation Rights of Persons Other Than Natural Parents or Grandparents, 1 A.L.R. 4th 1270 (1980). But see In re Marriage of Freel, 448 N.W.2d 26 (Iowa 1989) (concluding that absent a statute a custodial parent holds a veto power over the visitation rights of anyone except a parent); In the Matter of Alison D. v. Virginia M., 77 N.Y.2d 651, 656-57 (Ct. App. 1991) (determining that to allow the mother's former partner visitation with the child would impermissibly impair the mother's right to custody and control of her child); Cooper v. Merkel, 470 N.W.2d 253 (S.D. 1991) (concluding that a nonparent may be granted visitation rights over the objection of a biological parent only with a clear showing of parental gross misconduct, unfitness, or other extraordinary circumstances affecting the welfare of the child).
[38] Oral argument, October 12, 1994.
[39] A petitioner's contribution to a child's support need not be monetary.
[40] Through consent, a biological or adoptive parent exercises his or her constitutional right of parental autonomy to allow another adult to develop a parent-like relationship with the child. In this case, on the basis of the record before us, a circuit court could find that Knott had consented to and fostered Holtzman's formation and establishment of a parent-like relationship with the child, thereby sharing her parental rights. Several facts point to this consent including the parties' agreement about the conception of the child, the dedication ceremony naming both parties as the child's parents, and the child's name. An ongoing course of conduct by which Knott fostered Holtzman's parent-like relationship with the child can be demonstrated by these facts, as well as others such as Holtzman's care of the child and the child's close relationship with members of Holtzman's family.

An agreement between the parties could also indicate an adoptive or biological parent's consent to another to establish a parent-like relationship with the child. For the distinctions among express, implied-in-fact, and quasi contracts between two unmarried partners, see Watts v. Watts, 137 Wis. 2d 506, 405 N.W.2d 303 (1987).
[41] See also In re Marriage of Gayden, 229 Cal. App. 3d 1510, 1521-22 (Ct. App. 1991). Two decisions, both based on statutory grounds, have denied petitioners custody or visitation of children born to their former partners by artificial insemination. See, e.g., Nancy S. v. Michele G., 279 Cal. Rptr. 212, 217 (Ct. App. 1991) (refusing to grant nonparent visitation or custody but intimating that a nonparent could jointly adopt the child with the biological parent of the same sex, a remedy not permitted in Wisconsin); In the Matter of Alison D. v. Virginia M., 572 N.E.2d 27, 29 (N.Y. Ct. App. 1991) (refusing to grant standing to mother's live-in partner to seek visitation).
[1] The majority argues that Watts v. Watts, 137 Wis. 2d 506, 405 N.W.2d 305 (1987), supports the position that the legislative intent of ch. 767 may be applied to non-marital situations. Watts is completely irrelevant to determining the legislative intent behind ch. 767. The key element to the majority's discussion of this case, and to the holding of the case, is that it involved contract and property rights. That the two parties were involved in a "relationship" and that they "held themselves out as husband and wife" was only used as a misguided attempted defense to the contractual claims. In contrast, here the majority bases its entire decision on the relationship between Holtzman and Knott. Absent this relationship, Holtzman would not, even under the majority's tortured analysis, have standing to seek visitation. Thus, in Watts this court simply held that express and implied in fact contracts to share property will be enforced. As the Watts court noted, if such an agreement did not exist, the parties would have no recourse in the courts.
[2] 1987 Wis. Act 355.
[3] One can hardly fail to note the antagonism that exists between Ms. Holtzman and Ms. Knott. That is why the law, up to now, has wisely left it to the biological or adoptive parent to determine whether visitation is in the best interest of his or her own child. This has been true regardless of what the motive may be, good or bad, of a third party in seeking visitation. Thus, contrary to the statement in Justice Bablitch's concurrence, my conclusion is not that legislative silence "evinces a legislative intent that the best interests of these children have no protection whatsoever." Bablitch, J., concurring op. at 700. Rather, my conclusion is that the legislative silence evinces an intent that the child's best interests are best determined by the child's biological or adoptive parent instead of by the courts.
[4] Gotz v. Gotz, 274 Wis. 472, 80 N.W.2d 359 (1957), is not to the contrary. In that case, the court allowed visitation of the child's aunts to continue despite the objections of the biological father who had indefinite temporary custody of the child due to the mother's poor health. The court did not hold that the aunts had an independent right to visitation. Instead, the court upheld the visitation because it found the aunts to be the representatives of the biological mother, who had permanent custody of the child but who could not visit the child herself as she was residing in another state. Id. at 477.
[5] Further, given that the majority throws out Ms. Holtzman's custody claim because she did not present sufficient evidence to show that Ms. Knott is unfit and unable to care for her child, it is unlikely that Ms. Knott's decision to deny Ms. Holtzman visitation could ever be shown to have jeopardized the health or safety or to have had a potential for significant social burdens on Ms. Knott's child.
[1] Although the constitutional protection of parental autonomy is rooted primarily in the due process clause of the Fourteenth Amendment, the Supreme Court has stated that the right of parents to raise their children free from state intervention also finds support in the equal protection clause of the Fourteenth Amendment and in the privacy guarantees of the Ninth Amendment. Stanley v. Illinois, 405 U.S. 645, 651 (1971) (citing Skinner v. Oklahoma, 316 U.S. 535, 541 (1942) (equal protection clause); Griswold v. Connecticut, 381 U.S. 479, 496 (1965) (Goldberg, J., concurring) (privacy guarantees)).
[2] See Meyer v. Nebraska, 262 U.S. 390, 399 (1923); see also Hodgson v. Minnesota, 497 U.S. 417 (1990); Board of Educ. v. Mergens, 496 U.S. 226 (1990); Michael v. Gerald D., 491 U.S. 110, 118-19 (1988); Lehr v. Robertson, 463 U.S. 248, 257-58 (1982); Santosky v. Kramer, 455 U.S. 745 (1982); Quilloin v. Walcott, 434 U.S. 246 (1978); Moore v. East Cleveland, 431 U.S. 494 (1977); Wisconsin v. Yoder, 406 U.S. 205 (1972); Stanley v. Illinois, 405 U.S. 645 (1972); Prince v. Massachusetts, 321 U.S. 158 (1944), reh'g denied, 321 U.S. 804 (1944); Pierce v. Society of Sisters, 268 U.S. 510 (1925).
[3] The majority opinion states that "courts have reached no consensus about which statutorily-defined `actions affecting the family' suffice to meet the court-imposed `actions affecting the family' requirement with respect to petitions for visitation." Majority op. at 678. The majority provides no support for this assertion. Instead, it cites to the dissenting opinion in Cox, 177 Wis. 2d 433. A dissenting opinion does not change the law or demonstrate a lack of consensus on the part of "courts" throughout the state.
[4] The fact that two people of the same sex make a commitment to each other, exchange vows and rings in a private ceremony, and are named as a child's parents at the child's religious dedication ceremony is all irrelevant to the issue of visitation.
[5] In Soergel, we recognized that the statute was amended for the very purpose of making the statute applicable to persons who had maintained a parent-like relationship with the child. Soergel, 154 Wis. 2d at 567 n.2.
[6] Section 767.02(1), Stats., provides:

Actions affecting the family are:
(a) To affirm marriage.
(b) Annulment.
(c) Divorce.
(d) Legal separation (formerly divorce from bed and board).
(e) Custody.
(f) For child support, including an action under s. 767.65.
(g) For maintenance payments.
(h) For property division.
(i) To enforce or modify a judgment or order in an action affecting the family granted in this state or elsewhere.
(j) For periodic family support payments.
(k) Concerning periods of physical placement or visitation rights of children.
(L) To determine paternity.
(m) To enforce or revise an order for support entered under s. 48.355(2)(b)4., 48.357(4m) or 48.363(2).
[7] Dissenting in In Interest of Angel Lace M., 184 Wis. 2d 492, 516 N.W.2d 678 (1994), Justice Bablitch argued that the legislature is not responsive to issues such as the one present in this case and, therefore, this court should assume a certain amount of the legislative responsibility. However, the history of visitation law in Wisconsin does not bear this out. With respect to our prior decisions regarding visitation rights, the legislative response has been swift and direct. For example, the grandparent visitation statute was created shortly after our decisions in Weichman v. Weichman, 50 Wis. 2d 731, 184 N.W.2d 882 (1971), and Ponsford v. Crute, 56 Wis. 2d 407, 202 N.W.2d 5 (1972). Another example is 1991 Wis. Act 191, which effectively overruled our decision in In re Marriage of Soergel, 154 Wis. 2d 564, 453 N.W.2d 624 (1990).

Finally, as discussed in detail in Justice Day's dissent, the Senate recently passed 1995, Senate Bill 13 in direct response to our decision in Cox, 177 Wis.2d 433. Thus, contrary to the position taken by Justice Bablitch, the legislature has not silently sat and ambivalently watched this court develop the law of visitation. The legislature has closely followed this court's visitation law decisions, and it has spoken loudly when it disagreed with those decisions. For us to legislate in an area of law through four justices is a dangerous practice. The legislature is equally aware of the changes in society and may be relied on to act when legislation is required.
[8] Holtzman knew that Wisconsin did not recognize same sex marriages. Thus, she could not have had a reasonable expectation that she would eventually acquire legal parental status in this state.
[9] The majority purports to overrule any language in Z.J.H. prohibiting courts from granting visitation "on the basis of a co-parenting agreement between a biological parent and another when visitation is in a child's best interest." Majority op. at 691. No co-parenting agreement was alleged to exist in this case. Slip op. at 698 n.41. Therefore, whether circuit courts may grant visitation on the basis of a co-parenting agreement is not at issue in this case. The majority's attempt to overrule the Z.J.H. language regarding co-parenting agreements is clearly dicta.
[10] This court's "equitable power," where it has any such power, is self-regulated and not clearly defined. This is unsettling because if the court has equitable power even after the legislature has spoken, then at any time in the future a majority of this court could again invoke its equitable power and again change the test for standing to seek visitation if, in the court's opinion, doing so would be in the best interests of a child. For instance, suppose that a neighbor who has played a significant role in a child's development brings a petition for visitation rights to the child. Under the majority's current standing test, the neighbor lacks standing because he or she could not show, among other things, that he or she lived in the same household as the child. See majority op. at 694-695. However, if the court believes that it is in the child's best interest to grant visitation rights to the neighbor, the court can presumably invoke its equitable power, again rewrite the test for standing, and allow the neighbor to seek visitation.
[11] I agree with the statement by the concurrence that the issue in this case is not, and should not be, sexual orientation or sexual relationships. The issue is whether this court is legislating from the bench, ignoring past precedent, and giving lip service to the constitutional rights of biological parents. Nonetheless, one must wonder whether the majority would go to such lengths to reach the same conclusion if the person petitioning for visitation in this case were the biological mother's live-in boyfriend.
[12] The majority states that it is "mindful of preserving a biological or adoptive parent's constitutionally protected interests ...." Majority op. at 658, 694. Nonetheless, it gives those interests, like relevant past precedent, no weight in reaching its all too apparent predetermined legal conclusion. Clearly, this is a case where what the majority says and what it does are two entirely different things.
[1] Somewhat troubling on this point is the fact that Holtzman never argued that courts have the equitable power "to grant visitation apart from sec. 767.245, Stats., on the basis of a co-parenting agreement between a biological parent and another when visitation is in the child's best interest." Majority op. at 691. On the contrary, Holtzman centered her arguments on the fact that although sec. 767.245 controlled, it was broad enough to encompass the facts of this case. Although the majority recognizes that Holtzman's arguments derivative to the statute are erroneous, nonetheless, it proceeds to develop the "equitable powers" argument that the majority believes she should have made.
[2] In a footnote, the majority asserts that "[c]hapter 767 ordinarily does not apply unless there is a marriage or the dissolution of a marriage." Majority op. at 680 n.26. I agree that this is often true. However, until today it has not been a bright line rule. Even the case cited by the majority to support this conclusion is equivocal: the Family Code, of which ch. 767, Stats. is an integral part, "applies, for the most part, to those couples who have been joined in marriage according to law." Watts v. Watts, 137 Wis. 2d 506, 518-19, 405 N.W.2d 305, 309 (1987).